Cheryl A. Williams (Cal. Bar No. 193532)
Kevin M. Cochrane (Cal. Bar No. 255266)
caw@williamscochrane.com
kmc@williamscochrane.com
WILLIAMS & COCHRANE, LLP
28581 Old Town Front Street
Temecula, CA 92590
Telephone: (619) 793-4809

Attorneys for Plaintiff
PAUMA BAND OF MISSION INDIANS

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PAUMA BAND OF LUISENO MISSION INDIANS OF THE PAUMA & YUIMA RESERVATION**, a/k/a PAUMA BAND OF MISSION INDIANS, a federally-recognized Indian Tribe, <br><br> Plaintiff, <br><br> vs. <br><br> **UNITE HERE INTERNATIONAL UNION**; **STATE OF CALIFORNIA**; and **EDMUND G. BROWN, JR.**, as Governor of the State of California; <br><br> Defendants. | Case No.:  **'16 CV 2660 BAS JLB** <br><br> **COMPLAINT** |

Case No.:_____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

**INTRODUCTION**

1. A complex factual background actually yields the rather simple question of whether a party is bound to abide by a binding arbitration agreement to resolve certain statutory claims that it negotiated and accepted at a point in time when the relevant statute did not even apply to the conduct of the other contracting party. For sixty-five years, the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151 *et seq.*, did not cover Indian tribes or the enterprises they operated on their reservations. Nevertheless, as tribes in California obtained the right to operate gaming facilities under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2701 *et seq.*, after a decade-long battle with the Office of the Governor, UNITE HERE International Union ("Union") lorded from up on high and singlehandedly invalidated the compacts through court action simply because the deals lacked collective bargaining rules like those found within the private sector. *See Hotel Employees & Rest. Employees Int'l Union v. Davis*, 21 Cal. 4th 585 (1999) ("*HERE*"). As the tribes went back to the drawing board and tried to negotiate a new compact with then-Governor Gray Davis, the Union demanded a seat at the bargaining table and was bound and determined to keep tribes destitute unless the State of California ("State") agreed to assume jurisdiction over the federal labor law issues that the National Labor Relations Board ("NLRB" or "Board") previously ceded and create an alternate forum for resolving such disputes.

2. The labor provisions that the Union directly negotiated during these subsequent compact negotiations ("1999 Compact") are found in Addendum B to the agreement, which is called the Tribal Labor Relations Ordinance ("TLRO").[1] By the Union's own admission, the terms of the TLRO incorporate the employee protections of the NLRA; it

---

[1] A true and correct copy of the "Tribal-State Compact between the State of California and the Pauma Band of Mission Indians" is attached hereto as **Exhibit 1**. This compact is identical in all material respects to the 1999 Compacts previously executed by other tribes during the fall of 1999. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 618 F.3d 1066 (2010) ("*Colusa II*") ("These [1999] Compacts are substantively identical.").

1          Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

simply directs any claims that the NLRB was then declining to hear into a State-approved binding dispute resolution process that first tries to get the parties to resolve the dispute informally through face-to-face discussions before bringing in a panel of neutrals well-versed in federal Indian and labor law from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

3. Negotiating and agreeing upon these first-of-their-kind labor rules for sixty-plus Indian casinos in California was such a momentous event that the Union exclaimed that it was going to devote *all* of its resources towards advocating for tribal gaming in Sacramento and Washington, D.C. Of course, that promise lasted only as long as it took one of the wealthiest tribes in the State to start communicating with a rival union under the terms of the TLRO the Union had negotiated. After that, the scorned Union went back on its word and asked the overly-politicized NLRB to reverse seventy years of precedent and assume jurisdiction over Indian tribes – which it faithfully did at its constituent's request. *See San Manuel Indian Bingo & Casino,* 341 NLRB 1055 (2004) ("*San Manuel*").

4. Nevertheless, the Union still invoked the binding arbitration process of the TLRO to resolve a dispute with the Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation ("Pauma" or "Tribe") in the spring of 2012. However, the willingness of the Union to use this process disappeared after Pauma explained that any representational effort would have to take place according to the "secret ballot election" provisions of the TLRO rather than some extracontractual card check procedure that infringes on the ballot privacy rights of casino employees. With that, the Union went berserk, filing *nine* unfair labor practice charges against Pauma directly with the NLRB from 2013 onward. At present, some of these charges have been dismissed as meritless after administrative investigation, others are pending before the NLRB, while yet others are awaiting review by the United States Court of Appeals for the Ninth Circuit. Despite the differing postures, the one thing that all of these charges have in common is that they seek to turn Casino Pauma into a soapbox for the Union, whereby sympathetic employees

2                    Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

can communicate the Union's message *directly to customers* in any "guest area" of the gaming facility or associated property – whether that is within a shuttle bus, across a restaurant table, inside a family changing room, or underneath a bathroom stall.

5. What history shows is that the Union gets what it wants or tribes suffer. In this matter, the Union became disgruntled after failing to obtain enough employee support to stage a representational election according to standard NLRA rules that it successfully sought to incorporate into the TLRO, and somehow this grievance has spawned cases at practically every level of the federal system. The multiplicity of suits is perhaps only the second most distressing aspect of the present situation, with the first being that this trivial gripe about the applicability of self-negotiated election rules has morphed into extremely weighty questions concerning the separation of powers, federalism, and the true scope of federal statutes. All it takes to avoid addressing these sensitive issues is to require the Union to adhere to its original promise, and pay damages for its prior refusal to do so on nine separate occasions.

### JURISDICTION

6. The district court has jurisdiction over this action pursuant to the U.S. Const. art. I, § 8, cl. 3 ("Indian Commerce Clause"); 9 U.S.C. § 1 *et seq*. ("Federal Arbitration Act" or "FAA"); 25 U.S.C. § 2701 *et seq*. and interpretive case law such as *Cabazon Band of Mission Indians v. Wilson,* 124 F.3d 1050, 1055-56 (9th Cir. 1997); 28 U.S.C. § 1331 ("Federal Question Jurisdiction");  28 U.S.C. § 1362 ("Indian Tribes Jurisdiction"); 28 U.S.C. § 2201 *et seq*. ("Declaratory Judgment Act"); and § 9.1(d) of the 1999 Compact.

7. The State has waived its Eleventh Amendment immunity from suit in Cal. Gov't Code § 98005 and § 9.4(a) of the 1999 Compact.

8. Venue is proper in the United States District Court for the Southern District of California since Section 9.1(d) of the 1999 Compact requires that "[d]isagreements that are not otherwise resolved by arbitration or other mutually acceptable means… may be resolved in the United States District Court where the Tribe's Gaming Facility is located, or is to be located, and the Ninth Circuit Court of Appeals[.]" Furthermore, venue is also

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

proper under 28 U.S.C. § 1391(b)(1) and (c)(2) since both the State and the Union – through its Local 30 that is headquartered at 2436 Market Street, San Diego, California 92102 – reside in this district, as well as 28 U.S.C. § 1391(b)(2) since the activities giving rise to the alleged unfair labor practices that underlie this and the other related suits occurred within this district.

9. This action presents an actual and live controversy as to whether the TLRO obligates the Union to resolve any work related disputes – including unfair labor practice charges – through the binding dispute resolution process set forth within the ordinance rather than the administrative courts of the NLRB, and whether Pauma has and will continue to sustain damages as a result of the Union's refusal to abide by the terms of an agreement that it negotiated and accepted. The district court has the power to remedy this dispute in accordance with the Prayer for Relief, *infra*.

## PARTIES

10. The Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation is a federally-recognized Indian tribe whose reservation – and reservation-based gaming facility – is located in and around Pauma Valley in northern San Diego County.

11. UNITE HERE International Union is a labor union that represents service and manufacturing employees throughout the United States and Canada. The Union's Western Regional Office in located at 243 Golden Gate Avenue, San Francisco, California 94102. As explained in the jurisdiction section, *supra*, the Union also has a local affiliate in San Diego (*i.e.*, Local 30), the headquarters for which is at 2436 Market Street, San Diego, California 92102.

12. The State of California is the thirty-first sovereign state of the United States.

13. Edmund G. Brown, Jr. is the current Governor of the State of California, and Pauma brings this suit against him in his official capacity.

///

///

## GENERAL ALLEGATIONS

### I.   BACKGROUND ON THE NLRA

14. The NLRA is a federal statute designed to govern relations between certain private sector employers, labor unions, and employees. *See Chamber of Commerce of U.S. v. NLRB,* 721 F.3d 152, 154 (4th Cir. 2013).

15. Under Section 7 of the statute, eligible employees have the right to organize and bargain collectively through a representative of their choosing. *See* 29 U.S.C. § 157. In furtherance of this objective, the same Section 7 also protects the right of employees to engage in "concerted activities for the purposes of collective bargaining," such as seeking to improve working conditions through various dispute resolution fora. *See Morris v. Ernst & Young, LLP,* __ F.3d __, 2016 U.S. App. LEXIS 15638, *9-*10 (9th Cir. 2016) (citing 29 U.S.C. § 157).

16. To protect the rights of employees in these endeavors, the NLRA places limits on the conduct of both employers and unions, explaining that certain actions that could potentially interfere with concerted activities constitute unfair labor practices. *See* 29 U.S.C. § 158(a) & (b). For employers, chief amongst these is that it is an "unfair labor practice… to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C. § 158(a) & (a)(1).

17. A union or employee faced with what it believes to be an unfair labor practice by an eligible employer may file a complaint with the NLRB in the hopes of obtaining an order that directs the employer to cease and desist with the unlawful behavior and/or "take such affirmative action… as will effectuate the policies of the [NLRA]." *See* 29 U.S.C. § 160(c).

18. Conversely, a union or employee may waive the right to file an unfair labor practice claim with the NLRB by executing an arbitration agreement with the employer that provides an alternative forum for resolving such claims. *See, e.g., 14 Penn Plaza LLC v. Pyett,* 556 U.S. 247 (2009); *Morris,* __ F.3d __, 2016 U.S. App. LEXIS 15638.

19. Again, the provisions of the NLRA only apply to an entity that meets the

5          Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

statutory definition of an "employer," a term containing a governmental carve out that specifically excludes "the United States or any wholly owned Government corporation, or any Federal Reserve Bank, or any State or political subdivision thereof." 29 U.S.C. § 152(2).

20. Congress empowered the NLRB to interpret the language of this and other provisions of the statute in Section 6 of the Act, which provides in full that "[t]he Board shall have authority from time to time to make, amend, and rescind, in the manner prescribed by the Administrative Procedures Act, such rules and regulations as may be necessary to carry out the provisions of this Act." 29 U.S.C. § 156.

21. Pursuant to this power, the NLRB enacted a rule on November 7, 1959 that further defined the term "State" within the governmental exemption of Section 2(2) to include a host of similar political entities. *See* 29 C.F.R. § 102.7. According to the regulation, "[t]he term State as used [in section 2 of the NLRA] shall include the District of Columbia and all States, Territories, and possessions of the United States." *Id.*

22. For the next eighteen years (and the first forty-one years of the NLRA), Indian tribes were free from the application of the NLRA.

23. The NLRB first had occasion to examine the question of whether the statute should apply to Indian tribes in 1976 when a union local sought to direct an election at a reservation-based lumber mill owned and operated by the White Mountain Apache Tribe. *See Fort Apache Timber Co.,* 226 NLRB 503 (1976).

24. The jurisdictional analysis in the opinion opened with the NLRB explaining that "Indian tribes have been described, *inter alia*, as the equivalent of a State, or of a territory, as more than a State or territory, as independent or dependent nations, as a distinct political entity, as a separate political community, as quasi or semi-sovereign nations, and as a separate people, 'not brought under the laws of the Union or the State' when they preserved their tribal relations." *Fort Apache Timber Co.*, 226 NLRB at 506.

25. From there, the NLRB explained that "it is clear beyond peradventure that a tribal council such as the one involved herein – the governing body of the reservation – is

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

a government both in the usual meaning of the word, and as interpreted and applied by Congress, the Executive, and the Courts." *Fort Apache Timber Co.,* 226 NLRB at 506.

26. As part of this analysis, the NLRB cited an opinion from the Supreme Court of the United States five years earlier that explained the definition of employer in Section 2(2) was not intended to cover governments since "governmental employees did not usually enjoy the right to strike," and was thus meant to exclude entities like the Fort Apache Timber Mill that were "administered by individuals responsible to public officials." *Fort Apache Timber Co.,* 226 NLRB at 506 n.22 (citing *NLRB v. Natural Gas Util. Dist.,* 402 U.S. 600, 604 (1971)).

27. Based on this authority and others, the NLRB explained that it could "conclude that the Council is the equivalent of a State, or an integral part of the government of the United States as a whole, and as such specifically excluded from the [NLRA's] Section 2(2) definition of 'employer.'" *Fort Apache Timber Co.,* 226 NLRB at 506.

28. In closing, the NLRB held that the White Mountain Apache Tribe and any enterprises it operated – whether the timber mill at issue in the case or a different entity – were "exempt as employers within the meaning of the Act," reaching this conclusion without even having to consult the regulation it issued in 1957 to clarify the scope of the Section 2(2) governmental exemption. *Fort Apache Timber Co.,* 226 NLRB at 506.

II. **INTERSECTION OF THE NLRA AND IGRA**

29. The legal principle articulated in *Fort Apache Timber Company* that a "tribal commercial enterprise operating on the Tribe's reservation under the direction and authority of the Tribe's governing council" is exempt from the NLRA (*see Devils Lake Sioux Mfg. Corp.,* 243 NLRB 163 (1979)) remained in effect throughout the ensuing ten year period, at the end of which Congress enacted IGRA to detail the types of legal terms that may potentially apply to a tribe's reservation-based gaming activities. *See* 25 U.S.C. § 2710(d)(3)(C).

30. The types of permissible legal terms depend upon the form of gaming the tribe conducts. IGRA divides potentially-operable games into three separate categories. *See* 25

7                    Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

U.S.C. § 2703(6)-(8). At one end of the spectrum is "class I gaming," which largely consists of "traditional forms of Indian gaming." *See* 25 U.S.C. § 2703(6). Given its connection to tribal culture, class I gaming falls under the exclusive jurisdiction of the offering tribe and is not subject to the terms of IGRA. *See* 25 U.S.C. § 2710(a)(1). On the other end of the spectrum is "class III gaming," a term that includes house-banked card games, slot machines, and other forms of gaming that are traditionally seen in or associated with Las Vegas or Atlantic City casinos. *See* 25 U.S.C. §§ 2703(7)(B)(i), (ii); 2703(8); *In re Indian Gaming,* 331 F.3d 1094, 1097 (9th Cir. 2003) ("*Coyote Valley II*"). Unlike class I gaming, class III gaming, however, falls under the ambit of IGRA and is subject to a tripartite oversight scheme that involves varying degrees of tribal, state, and federal regulation. *See Coyote Valley II*, 331 F.3d at 1097.

31. As for changes in existing federal laws, the principal section of IGRA exempts tribes from the prohibition imposed by a separate federal statute on the possession or transport of gambling devices (*see* 25 U.S.C. § 2710(d)(6) (citing 15 U.S.C. § 1175)), but does not invalidate (or even address) the *Fort Apache Timber Company* rule by extending federal labor laws to reservation-based gaming facilities that are operated in accordance with the terms of IGRA.

32. Rather, ancillary regulation of this nature is left for inclusion in a compact that the surrounding state can negotiate with the tribe. IGRA arose against a backdrop in which state laws only apply on Indian reservations if Congress has expressly indicated. *See, e.g., California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 207 (1986). For all intents and purposes, this means that states have no civil authority on Indian reservations while the small sect of Public Law 280 states like California (*i.e.,* the six states who have assumed federal criminal jurisdiction over offenses committed in Indian County) may enforce criminal laws so long as they are truly prohibitory in nature rather than regulatory. *Id.* at 209. Thus, the compact requirement in IGRA gives the state a new voice in the civil regulation of gaming activities that are legal within the borders of the state and available to be conducted by an Indian tribe.

33. The inner workings of the compact process are laid out in IGRA, which begins with a tribe requesting that a state commence "negotiations for the purpose of entering into a Tribal-State compact governing the conduct of [class III] gaming activities." 25 U.S.C. § 2710(d)(3)(A).

34. Upon receiving such a request, the state "shall negotiate with the Indian tribe in good faith to enter into such a compact." 25 U.S.C. § 2710(d)(3)(A).

35. The negotiations between the tribe and the state may only concern the seven subjects listed in IGRA that pertain to such things as the "standards for the operation of such activity and maintenance of the gaming facility" and "any other subjects that are directly related to the operation of gaming activities." 25 U.S.C. § 2710(d)(3)(C)(vi).

36. The federal courts have interpreted the final "directly related to the operation of gaming activities" catch-all provision as permitting the negotiation of outside labor laws, whether a state imposes its own or adopts those of the NLRA at a time when the NLRB declined to assert jurisdiction over tribal enterprises. *See Coyote Valley II*, 331 F.3d at 1115-16.

**III.  COMPACTING IN CALIFORNIA – THE PALA COMPACT**

37. For more than a decade after the enactment of IGRA, the State of California refused to negotiate with tribes for compacts that covered the operation of class III gaming devices. *See HERE,* 21 Cal. 4th at 597.

38. After certain tribes (other than Pauma) became impatient with the State's intransigence and began operating gaming devices outside of the compact scheme created by IGRA, then-Governor Pete Wilson agreed to commence negotiations with a single non-gaming tribe named the Pala Band of Mission Indians in hopes of crafting a compact that would serve as the statewide template. *See HERE,* 21 Cal. 4th at 597.

39. The resultant one-hundred-and-thirty-two-page gaming compact contained a slew of regulations that covered everything from the licensure of employees and stakeholders, to procedures for resolving patron disputes, to payments to the State and local communities, to the creation of economic development zones, to employee

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

protections.[2]

40. As noted in the subsequent approval letter from the Assistant Secretary, provisions relating to employer and employee relations "ha[d] not been included in other tribal-state compacts" up until that point. Despite this, Section 13 of the Pala Compact incorporated the protections of the NLRA by using nearly verbatim language to describe the rights of employees and unfair labor practices by the tribal employer. The relevant provision in the Pala Compact (*i.e.*, Section 13.7.1) that describes these rights and limitations states in full:

> The Tribe's Service Employees have the right to self-organization, to form, join, or assist employee organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection. The Tribe shall refrain from any interference with, restraint or coercion of Service Employees in the exercise of these rights; provided that the exclusive remedy for a violation of these obligations shall be the arbitration set forth in subsection 13.7.2.

41. Along with providing for these substantive rights, the Pala Compact also created a fair and neutral forum for resolving unfair labor practice charges by having the parties submit such complaints to arbitration before an arbitrator supplied by the Federal Mediation and Conciliation Service who both resides in California and is a member of the National Academy of Arbitrators.

42. The Union played a significant role in the negotiation of the employee protections in the Pala Compact. As the California legislature provided its stamp of approval for the compact by passing Senate Bill 287, the Union, through its Political Action Committee named the Coalition Against Unregulated Gambling, issued a news release on August 27, 1998 wherein Jack Gribbon, the Political Director for the Union, applauded Pala and the select other tribes who had signed on to the model compact for

---

[2] A true and correct copy of excerpted portions of the "Tribal-State Compact between the State of California and the Pala Band of Mission Indians," and its associated April 25, 1999 approval letter from the Assistant Secretary for Indian Affairs, is attached hereto as **Exhibit 2**.

finding "it appropriate to include in their compacts the same type of worker rights at Indian casinos as you would find off-reservation."[3]

43. Just weeks later, on September 10, 1998, the author of the bill and President pro Tempore of the Senate John Burton sent a letter to Gribbon to "extend a special thanks to you for all of your hard work in support of SB 287." In the letter, Senator Burton praised the "Union's ability to meet with legislators in both houses and convince them of the importance of" the compacts and "the institution of workers' rights to organize for the first time at Indian casinos anywhere in the United States."[4]

44. In preparing an analysis of the terms of the Pala Compact the same month, the California Research Bureau ("CRB") framed the discussion of employee rights by explaining that "labor laws generally do not apply on reservations." The CRB elaborated on this statement by then explaining "[t]he National Labor Relations Act (NLRA) is the most important federal legislation for collective bargaining. This law does not apply to reservations. Congress saw tribes as governments and also exempted state and local governments from the NLRA."[5]

**IV.   COMPACTING IN CALIFORNIA – PROPOSITION 5 AND *HERE V. DAVIS***

45. Substantive terms in the Pala Compact like the workplace provisions that encroached on tribal sovereignty by imposing external regulation produced a backlash from tribes, who objected not only to the terms of the agreement but also the procedural manner in which Governor Wilson had negotiated a compact that was supposed to serve as the template for all that followed. *See Coyote Valley II*, 331 F.3d at 1100 n.7.

46. As a result, an assemblage of California tribes obtained more than 1,000,000

---

[3] A true and correct copy of the August 27, 1998 news release entitled "Coalition Against Unregulated Gambling Lauds Legislative Approval of Tribal-State Compacts" is attached hereto as **Exhibit 3**.
[4] A true and correct copy of the September 10, 1998 letter from John L. Burton to Jack Gribbon is attached hereto as **Exhibit 4**.
[5] A true and correct copy of excerpted portions of the September 1998 California Research Bureau report entitled "Indian Casinos in California" is attached hereto as **Exhibit 5**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

signatures (requirement was 400,000) in order to put a proposition on the ballot for the November 1998 General Election. The proposition known as Proposition 5 would amend the California Government Code to include a form compact that the Governor would have to execute with any interested tribe as a ministerial act within thirty (30) days of receiving a request. *See Coyote Valley II,* 331 F.3d at 1100.

47. One of many substantive differences between the Pala Compact and the Proposition 5 Compact is that the latter did not contain any provisions concerning the collective bargaining rights of casino employees even though it addressed other basic workplace issues like work-related injuries, disabilities, and unemployment. *See Coyote Valley II,* 331 F.3d at 1102 (citing Cal. Gov't Code § 98004, Sec. 10.1(f)).

48. The failure to include organizational rights in the Proposition 5 model compact sparked ardent opposition from the Union, who teamed up with those Las Vegas casinos that recognized its representative status (and employed upwards of 25% of its members) to form the aforementioned Political Action Committee Coalition Against Unregulated Gambling.[6]

49. In total, the Coalition Against Unregulated Gambling spent nearly $30,000,000 opposing Proposition 5 in what became, at the time, the most expensive ballot initiative contest in the State's history.[7] *See* California Secretary of State, Selected Campaign Financial Analyses at 98-E, *available at* http://www.sos.ca.gov/campaign-lobbying/ selected-campaign-financing-analyses/ (last visited Oct. 2, 2016).

50. Despite the opposition by the Union and Las Vegas casinos, the people of the State approved Proposition 5 by a "wide margin," and specifically by a vote of 62.38% to 37.62%. *Coyote Valley II*, 331 F.3d at 1101; *see* California Secretary of State, Selected Campaign Financial Analyses at 98-E, *available at* http://www.sos.ca.gov/campaign-

---

[6] A true and correct copy of the sponsor list for the Coalition Against Unregulated Gambling is attached hereto as **Exhibit 6**.

[7] A true and correct copy of excerpts of the Coalition Against Unregulated Gambling's financial disclosure statements is attached hereto as **Exhibit 7**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

lobbying/selected-campaign-financing-analyses/ (last visited Oct. 2, 2016).

51. After failing to block the measure politically, the Union shifted tactics and filed a petition for writ of mandate directly with the California Supreme Court in an attempt to invalidate Proposition 5 on the basis that the gaming rights conferred by the statutory compact violated the prohibition in Article IV, Section 19(e) of the State Constitution that says "[t]he Legislature has no power to authorize, and shall prohibit, casinos of the type currently operating in Nevada and New Jersey." Cal. Const. art. IV, § 19(e); *see HERE,* 21 Cal. 4th at 590.

52. In a news article run by the Las Vegas Sun during the pendency of the petition, the Union's longtime Las Vegas-based attorney Richard McCracken explained that "[t]he Union's primary interest in the initiative is to ensure worker's rights," and he preferred that the neighboring state of California enact compacts through negotiation so they would include "worker protections, health and safety and environmental standards" that were satisfactory to the Union.[8]

53. Elaborating on his client's primary interest further, McCracken explained to a reporter with the Los Angeles Times that the "[U]nion opposed Proposition 5 because it did not give casino workers the right to organize or protect them from unfair working conditions."[9]

54. The Union reiterated these sentiments in a press release after the release of the California Supreme Court's decision, wherein it stated that "[w]e had no choice but to oppose Proposition 5 and to subsequently file suit against its implementation. If Proposition 5 had become law, it would have denied the 15,000 plus workers in the Indian gaming industry in California the most basic employment rights on into perpetuity."[10]

---

[8] A true and correct copy of a June 2, 1999 Las Vegas Sun news article entitled "LV labor lawyer leads assault on Prop 5" is attached hereto as **Exhibit 8**.

[9] A true and correct copy of an August 24, 1999 Los Angeles Times news article entitled "State High Court Overturns Indian Gaming Initiative" is attached hereto as **Exhibit 9**.

[10] A true and correct copy of an August 23, 1999 Union press release entitled

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

55. These arguments carried over to the lawsuit and served as the basis for seeking interim relief. Through the petition, the Union not only requested the extraordinary remedy of having the California Supreme Court rule *in the first instance* on the validity of Proposition 5, but also asked for a stay pendente lite. *See HERE,* 21 Cal. 4th at 590.

56. According to the petition filed by McCracken, the alleged harm justifying the issuance of a stay was twofold. The first harm was anti-competitive in nature, with the supporting argument explaining that the private card rooms in the State with Union-represented employees would be harmed by the influx of tribal competition, which would result in the Union's "members irretrievably losing their jobs and seeing labor market conditions in their industry decline."[11]

57. The second articulated harm related to the absence of organization rights that McCracken bemoaned in the Las Vegas Sun and Los Angeles Times news articles. Within the petition, McCracken explained there was a "further obstacle to [the Union] and its members" that arose "from tribal insistence that the National Labor Relations Act does not cover reservation operations." Despite framing this issue as "tribal insistence," McCracken ended the sentence by citing *Fort Apache Timber Company* and a just-released, post-IGRA NLRB opinion that similarly held that the NLRA does not apply to tribal enterprises located on the reservation. *See S. Indian Health Council,* 290 NLRB 436 (1998).

58. A reiteration of these claimed harms was within a declaration that McCracken submitted in connection with the reply brief in support of the petition. The declaration from the Union's Western Regional Director again claimed that the "[U]nion and its members" would be harmed because of the "tribal casinos' exemption from state labor laws (and from claims of exemption from the National Labor Relations Act)." In the

---

"Hotel Employees and Restaurant Employees International Union Applauds Court for Upholding State's Role in Human Rights Negotiations" is attached hereto as **Exhibit 10**.

[11] A true and correct copy of excerpts from the November 20, 1998 Union filing in *HERE* entitled "Petition for Writ of Mandate" is attached hereto as **Exhibit 11**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

opinion of the Union declarant, the tribes' frequent claims "that employees of reservation facilities are not protected by the National Labor Relations Act" meant that "tribal gaming employees are unlikely to organize without a compact like the Pala [C]ompact."[12]

59. As for any countervailing harms to the gaming and non-gaming tribes alike who sought to better provide for their members through the Proposition 5 compact, McCracken downplayed any injuries by explaining that those tribes could simply sit down with the incoming Governor Gray Davis and the Union and negotiate a different compact that addressed the Union's concerns about "tribal labor law compliance." The Union put forward this argument even though the previous Deukmejian and Wilson administrations had only been willing to negotiate one gaming device compact (*i.e.*, the Pala Compact) during the first thirteen years of IGRA.[13]

60. Nevertheless, McCracken prevailed in convincing the California Supreme Court of the supposed harms the Union would suffer from the tribes' exemption from the NLRA, as the Court issued an order on December 2, 1998 staying implementation of Proposition 5 pendente lite and directing the Governor, the Secretary of State, and the Real Parties in interest to show cause why the relief requested by the Union should not be granted. *See HERE,* 21 Cal. 4th at 590-91.

61. Ultimately, on August 23, 1999, the California Supreme Court issued the writ requested by the Union, and thus prohibited the State from implementing all but one provision of Proposition 5 (*i.e.*, the general waiver of the State's sovereign immunity for compact actions set forth in Section 98005 of the Government Code). The petition filed by the Union, in other words, invalidated the model compact in Proposition 5 and left the tribes searching for alternate means to obtain compacts.

---

[12] A true and correct copy of the November 30, 1998 Union filing in *HERE* entitled "Declaration of Sherri Chiesa in Support of Petitioner's Application for Stay" is attached hereto as **Exhibit 12**.

[13] A true and correct copy of excerpts from the November 30, 1998 Union filing in *HERE* entitled "Petitioner's Brief in Support of Application for Stay" is attached hereto as **Exhibit 13**.

## V.   COMPACTING IN CALIFORNIA – THE 1999 COMPACTS

62. Fortunately for the tribes, shortly after Governor Gray Davis came into office eight months earlier he began compact negotiations with sixty-plus tribes for the purpose of devising a compact that was different from the one approved by the voters as part of Proposition 5. *See Coyote Valley II*, 331 F.3d at 1101-02.

63. The initial compact negotiation sessions took place in May of 1999, and the State's negotiator explained at the outset that his client wanted to stay as close to the text of Proposition 5 as possible, "but identified what it believed to be a few key deficiencies in the Proposition 5 model compact." *Coyote Valley II*, 331 F.3d at 1102. Among these deficiencies were inadequate revenue sharing payments to the State and the failure of Proposition 5 to address the collective bargaining rights of casino employees. *Id*.

64. The latter issue was something the negotiating tribes could work out directly with the Union, according to the State's negotiator. *See Coyote Valley II*, 331 F.3d at 1102. However, the pendency of *HERE v. Davis* and the consequent reality that the Union was actively trying to invalidate a statutory compact that was thirteen years in the making meant that the initial discussions between the parties were unfruitful. As a result, the Union communicated to the California Legislature its opposition to any legislation that would ratify a compact resulting from the negotiations between Governor Davis and the participating tribes on May 24, 1999, June 8, 1999, and throughout the remainder of the summer.[14][15][16][17]

---

[14]   A true and correct copy of a May 24, 1999 letter from the Law Office of Barry Broad to "All Members of the Assembly" is attached hereto as **Exhibit 14**.

[15]   A true and correct copy of a June 8, 1999 letter from the Law Office of Barry Broad to "All Members of the Senate Governmental Organization Subcommittee on Gaming" is attached hereto as **Exhibit 15**.

[16]   A true and correct copy of a circa September 10, 1999 urgent legislative alert from Assemblyman and Republican Caucus Chairman Jim Battin to "All Tribal Leaders" is attached hereto as **Exhibit 16**.

[17]   A true and correct copy of a circa September 11, 1999 letter from Assemblyman and Republican Caucus Chairman Jim Battin entitled "Indian Gaming Bill Victorious after Lengthy Floor Debate" is attached hereto as **Exhibit 17**.

65. The annual legislative session ended on September 10, 1999, and the parties treated this date as the drop-dead date by which the California Legislature would have to approve the signed compacts in order to prevent the United States Attorney's Office from taking enforcement actions against those tribes operating outside the compacting scheme while the legislature was adjourned for the year. *See Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California,* 629 F. Supp. 2d 1091, 1111 (E.D. Cal. 2009) ("*Colusa I*" and generally "*Colusa*"); *Colusa*, No. 04-02265, Dkt. No. 95-2 at ¶ 12 (E.D. Cal. Mar. 19, 2009).

66. At approximately 8:00 p.m. on the evening of September 9, 1999, the State's negotiator presented the tribes with the State's final compact offer and explained that the tribal leaders had until 10:00 p.m. (a deadline that was later extended until midnight) to approve or reject the proposal. *Colusa I,* 629 F. Supp. 2d at 1111.

67. The proposal contained a number of new terms, including a convoluted license pool formula for determining the exact number of gaming devices that each tribe could operate. *Colusa I,* 629 F. Supp. 2d at 1096. Since the tribes had been unable to agree upon labor relations provisions with the Union, the September 9th compact proposal also included a Section 10.7 that required the tribes to sit down with the Union and negotiate "an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III gaming employees" by October 13, 1999. *See Coyote Valley II,* 331 F.3d at 1106. The text of this Section 10.7 states that

> This Compact shall be null and void if, on or before October 13, 1999, the Tribe has not provided an agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise, such as food and beverage, housekeeping, cleaning, bell and door services, and laundry employees at the Gaming Facility or any related facility, the only significant purposes of which is to facilitate patronage at the Gaming Facility.

68. Fifty-seven tribes participating in the negotiations signed letters of intent to execute the compacts on the evening of September 9, 1999 in accordance with the State's

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

request. *See Coyote Valley II,* 331 F.3d at 1104. With that, the signatory tribes continued to negotiate collective bargaining rights for casino employees with the Union, with the aim of finalizing and executing an agreement by the October 13, 1999 deadline.

69. In a speech given to the American Bar Association during its Midwinter meeting in 2005, the Union's longtime counsel McCracken admitted that the "tribes and union representatives" negotiated the labor agreement that would become part of the 1999 Compact.[18]

70. The resultant agreement known as the "Tribal Labor Relations Ordinance" is a model set of terms that each signatory tribe executed as "Addendum B" to its version of the 1999 Compact.

71. The structure of the TLRO resembles that of the Pala Compact in that it incorporates the express provisions of the NLRA, from the right of employees to engage in concerted activities, to the unfair labor practices of the tribal employer, to the unfair labor practices of unions.

72. Section 4 of the TLRO pertains to the organizational rights of employees and incorporates the language of the concomitant Section 7 of the NLRA almost verbatim, stating in full that

> Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

73. Unfair labor practices by an employer that are detailed within Section 8 of the NLRA are also in the TLRO at Section 5, which lists the unlawful acts virtually word for word aside from making one minor revision to accommodate the Indian tribes' Constitutionally-protected right to engage in Native preference in employment. *See Morton v.*

---

[18] A true and correct copy of excerpts of a 2005 presentation given by Richard G. McCracken to the Midwinter Meeting of the American Bar Association entitled "San Manuel Indian Bingo and Casino: Centrally Located in the Broad Perspective of Indian Law" is attached hereto as **Exhibit 18**.

*Mancari,* 417 U.S. 535 (1974). In full, Section 5 of the TLRO states:

> It shall be an unfair labor practice for the tribe and/or employer or their agents:
>
> (1) to interfere with, restrain or coerce Eligible Employees in the exercise of the rights guaranteed herein;
>
> (2) to dominate or interfere with the formation or administration or any labor organization or contribute financial or other support to it, but this does not restrict the tribe and/or employer and a certified union from agreeing to union security or dues checkoff;
>
> (3) to discharge or otherwise discriminate against an Eligible Employee because s/he has filed charges or given testimony under this Ordinance;
>
> (4) to refuse to bargain collectively with the representatives of Eligible Employees.

74. In yet another similarity to the Pala Compact, the TLRO foregoes NLRB jurisdiction in favor of resolving unfair labor practice charges and any other work related issues arising under the ordinance "exclusively" through arbitration. Section 13(a), which details the parties' commitment to abide by the arbitration-based dispute resolution process detailed within the TLRO, states in full:

> All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution.

75. Out of due respect for tribal sovereignty, the first level of the binding dispute resolution process is simply an informal meet and confer process whereby the aggrieved union presents its claim to the responsible tribal body – whether that is the Tribal Council, Business Committee, or a Grievance Board – in order to give it a chance to resolve the dispute before heading into arbitration.

76. As that final word indicates, the second level of the dispute resolution process consists of submitting the case to arbitration before a mutually-agreed-upon arbitrator or arbitrators from a ten-member "Tribal Labor Panel" created under the TLRO that consists of neutrals experienced in "federal labor law and/or federal Indian law" who are recommended by reputed providers like the Federal Mediation and Conciliation Service

and the American Academy of Arbitrators.

77. Every signatory tribe to the 1999 Compact subsequently executed the TLRO that the Union negotiated by the deadline imposed by the State within Section 10.7 of the principal agreement.

78. As explained earlier, the NLRB ceded jurisdiction over reservation-based tribal enterprises at the time the State demanded that signatory tribes to the 1999 Compact execute the TLRO as a precondition to entering into the contract.

79. Implementing the TLRO seemingly effectuated the vision of the Union's Political Director Gribbon, who told a reporter for the Los Angeles Times in the wake of the *HERE* decision that "[w]e want casino compacts that everyone can embrace… in which Indians can enjoy economic expansion and workers have the right to pick a union of their choice. We want to work together on this."

80. Moreover, the creation of the TLRO should have brought an end to the strife between California tribes and the Union according to the latter's own words, as the Union stated in its post-*HERE* press release that reaching agreement on labor guarantees in the 1999 Compact would result in the Union changing its posture from fighting tribes to supporting them. In pertinent part, the press release states that, "[i]f this issue [or employees' organizational rights] can be resolved by Governor Davis and gaming tribes in California, our Union will commit all of our resources and hard work – along with the full support of the national labor movement – to advocate both in Sacramento and Washington, D.C. for economic development opportunities through gaming for all of the California tribes."

## VI.   THE UNION GOES BACK ON ITS WORD AND DEMANDS MORE IN *SAN MANUEL INDIAN BINGO & CASINO*

81. Any commitment to cooperation on the part of the Union disappeared not long after the ink was dry on the 1999 Compact and the TLRO therein. Rather than devote "all of [its] resources…to advocate[ing]… for economic development opportunities through gaming for all of the California tribes" as it promised, the Union, though its longtime

counsel McCracken, pursued an unfair labor practice charge against the San Manuel Band of Mission Indians – a uniquely-situated tribe on the outskirts of Los Angeles that just so happens to be one of the wealthiest and smallest tribes in the Nation – before the NLRB in hopes of convincing the Board to change its stance on tribal jurisdiction nearly seventy years after the enactment of the NLRA. As for the basis of the alleged unfair labor practice, the Union's grievance with San Manuel arose from the band working with a rival union (*i.e.*, the Communication Workers of America) to organize its casino employees in lieu of the Union, which had spent the prior two years trying to deprive the tribes of the legal basis to operate their casinos simply because they would not agree to the external labor laws the Union found desirable. *See San Manuel,* 341 NLRB at 1055.

82. The strategy worked, as on May 28, 2004, the Board released a decision in which it "decided to overrule *Fort Apache* and… establish a new standard for determining the circumstances under which the Board will assert jurisdiction over Indian owned and operated enterprises" in an opinion, the discussion section for which begins by talking about the tribes' supposed newfound wealth as a result of casinos and other businesses. *See San Manuel,* 341 NLRB at 1056.

83. Nearly twenty years before the issuance of the decision in *San Manuel*, the Supreme Court explicitly disclaimed the use of tests that try to distinguish between "traditional" government and commercial functions, as such tests had proven to be "untenable," "unworkable," "unmanageable," and "unsound." *Garcia v. San Antonio Metro. Transp. Auth.,* 469 U.S. 528, 542-47 (1985). Among the many problems with these tests, the "most obvious" in the opinion of the Court, was that they failed to "accomodat[e] changes in the historical functions of States, changes that have resulted in a number of once-private functions like education being assumed by States and their subdivisions." *Id.* at 543-44. Another notable problem with such tests is that they invite the judiciary, often in contravention of the political process, to make policy judgments by picking out which functions "it favors and which ones it dislikes." *Id.* at 546.

84. Despite these longstanding principles in *Garcia,* the NLRB invented a test for

gauging whether the Board would now assert jurisdiction over Indian tribes that – while couched in terms of a Ninth Circuit opinion that predates *Garcia* called *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113 (9th Cir. 1985) – simply asks whether a tribe has preclusive treaty rights that would bar the assertion of jurisdiction, and, if not, whether the enterprise at issue is commercial or governmental in nature. *San Manuel,* 341 NLRB at 1063. According to the NRLB, "[r]unning a commercial business is not an expression of sovereignty in the same way running a tribal court system is," and thus such businesses should fall under the Board's jurisdiction. *Id.* Conversely, where tribes "continue to act in a manner consistent with [their] mantle of uniqueness" by engaging in "traditional tribal or governmental functions," the Board may use its discretion to refrain from exercising jurisdiction, though it can still do otherwise. Thus, the decision in *San Manuel* inverted the NLRB's tribal jurisdiction jurisprudence, taking the general rule that all tribal commercial enterprises (at least those located on the reservation) were exempt from jurisdiction and turning it into a nearly irrefutable presumption that such enterprises fall under the NLRA.

85. In the course of overruling *Fort Apache Timber Company*, the NLRB discusses its interpretation of the word "State" as used in the government exemption in Section 2(2) of the NLRA, but says nary a word about the regulation the Board enacted in 1959 to clarify the term and whether tribes fall within the meaning of the word "possession" as used in the clarifying regulation. *See, e.g., Posadas v. Nat'l City Bank,* 296 U.S. 497 (1936) (explaining that a dependency is a possession over which a nation exercises sovereignty by right of conquest); *Cherokee Nation v. Georgia,* 30 U.S. 1 (1831) (defining tribes as "domestic dependent nations" following their conquest by the United States).

86. Harkening back to the language at the outset of the discussion section in the *San Manuel* opinion, McCracken acknowledged in a presentation to the American Bar Association that *San Manuel* was simply "the latest proof" of the "ineluctable tendency for other governments to assert themselves" over Indian tribes as their "enterprises

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

become larger."

87. In the twelve years since the release of *San Manuel*, the NLRB has not issued a single opinion in which it declined to exert jurisdiction over a tribal entity on account of the newfound "traditional tribal or governmental function" exemption. Further, the only time the NLRB refrained from exerting jurisdiction over a tribal commercial enterprise was supposedly due to unique treaty rights, occurred in a circuit that disagrees with the NLRB's position on its ability to hear cases involving tribal defendants (*see NLRB v. Pueblo of San Juan*, 276 F.3d 1186 (10th Cir. 2002)), and arose at a point in time when the Board was trying to avoid creating an active circuit split that would increase the likelihood of the Supreme Court taking up the jurisdictional question. *Compare Chickasaw Nation,* 362 NLRB No. 109 (2015) with *NLRB v. Little River Band of Ottawa Indians Tribal Gov't,* 788 F.3d 537 (6th Cir. 2015) and *Soaring Eagle Casino & Resort v. NLRB,* 791 F.3d 648 (6th Cir. 2015).

88. The opinion in *San Manuel* marks just one area in which the NLRB has reversed decades of precedent in order to increase its power to make up for declining union membership rates. *See* Bureau of Labor Statistics*,* Union Members – 2015, *available at* http://www.bls.gov/news.release/pdf/union2.pdf (last visited Oct. 5, 2016) (explaining that the union membership rate amongst wage and salary employees has decreased from 20.1% in 1983 to 11.1% in 2015). The NLRB has created similar protected-behavior-versus-commercial-activity tests in order to establish nearly irrefutable presumptions of jurisdiction over religious facilities, charter schools, and claims brought by graduate students. *See, e.g., Pacific Lutheran Univ.,* 361 NLRB No. 157 (2014) (explaining NLRB jurisdiction is proper unless a religious university shows that it holds out its faculty members as performing a religious function); *Hyde Leadership Charter Sch.,* 364 NLRB No. 88 (2016) (finding that charter schools are private commercial enterprises rather than public entities); *Trustees of Columbia Univ.,* 364 NLRB No. 90 (2016) (classifying graduate students as employees rather than as students). When not bringing new classes of employers and employees under its ambit,

23                    Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

the NLRB has also rewritten the law in other areas to significantly strengthen the powers of unions by, amongst other things, tightening the rules for hiring permanent replacements for striking workers (*see Am. Baptist Homes of W.,* 364 NLRB No. 13 (2016)), continuing dues payments after the expiration of a collective bargaining agreement (*see WKYC-TV, Inc.*, 359 NLRB No. 30 (2012)), and allowing an employee to obtain more than "make whole" relief if the NLRB finds that the employee was fired in violation of the NLRA. *See King Soopers, Inc.,* 364 NLRB No. 93 (2016).

**VII.   PAUMA EXECUTES THE 1999 COMPACT AND THE STATE SUBSEQUENTLY FORCES RENEGOTIATIONS TO OBTAIN MORE REVENUE SHARING**

89. Unlike a number of other tribes in California, Pauma did not engage in gaming prior to the advent of the 1999 Compacts and instead relied upon subsistence farming and federal funding to stave off destitution.

90. Despite this, the Pauma membership still had a 55% unemployment rate and a per capita income of $11,711 as of 1999. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, No. 14-56104, Dkt. No. 29-1, p. 12 (9th Cir. Apr. 13, 2015) ("*Pauma II*").

91. Extreme poverty left the Pauma membership vulnerable to malignancies, which is an issue of general concern in Indian County since, according to the Indian Health Service, Indians "have a life expectancy that is 4.6 years less than the U.S. all races population," and "die at higher rates than other Americans from tuberculosis (500% higher), alcoholism (519% higher), diabetes (195% higher), unintentional injuries (149% higher), homicide (92% higher), and suicide (72% higher)." *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, No. 09-01955 CAB MDD, Dkt. No. 130, 39:6-10 (S.D. Cal. Sept. 9, 2011) ("*Pauma I*").

92. Against this socioeconomic backdrop, Pauma executed a form version of the 1999 Compact – including the TLRO in Addendum B – with the State on May 1, 2000 through a simple exchange of letters with the Office of the Governor. *See Pauma I,* Dkt. No. 130, 11:18-12:11 (S.D. Cal. Sept. 9, 2011).

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

93. The first of the three letters in this back-and-forth between the parties was sent by Pauma on April 6, 2000, and was the Tribe's first communication with the State about the 1999 Compacts since it did not have any involvement in the negotiations for the 1999 Compact or TLRO therein. *See Pauma I,* Dkt. No. 130, 11:16-22 (S.D. Cal. Sept. 9, 2011).

94. By May of the following year, Pauma had opened a temporary tent gaming facility housing 850 machines that was, or would soon be, surrounded by much larger resort casinos operated by neighboring tribes who either had prior experience gaming or significant involvement in the compact negotiations that took place from 1998 to 1999.

95. As to that, the Pauma reservation is located in an unincorporated area of northern San Diego County known as Pauma Valley, and is surrounded by the reservations of much larger gaming tribes.

96. In relation to the Pauma reservation, approximately five miles to the west is the reservation for the Pala Band of Mission Indians ("Pala"), five miles to the east is that for the Rincon Band of Luiseno Mission Indians ("Rincon"), fifteen miles to the northwest is that for the Pechanga Band of Luiseno Indians ("Pechanga"), and ten miles to the southeast is that for the San Pasqual Band of Mission Indians ("San Pasqual"). *See* Bureau of Indian Affairs, Tribal Leaders Directory Map, *available at* http://www.bia.gov/tribalmap/DataDotGovSamples/tld_map.html (last visited Oct. 5, 2016). The geographic layout of the surrounding reservations ensures that any potential customers from the coastward areas stretching from San Diego to Los Angeles who are travelling north or south on Interstate 15, or east on the State Road 76/78 loop, in the hopes of visiting an Indian reservation will invariably have to pass at least one of these neighboring tribes before reaching Pauma.

97. Each of these neighboring tribes currently has the ability to operate at least 2,000 gaming devices within a destination resort casino. In fact, Pechanga – which is located just off of Interstate 15 in Temecula, California – has the largest casino in the western United States and operates over 4,000 gaming devices. *See* Pechanga Resort &

Casino, Homepage, *available at* https://www.pechanga.com/ (last visited Oct. 5, 2016).

98. Being situated between large gaming tribes hampered the revenue producing capabilities of Pauma's gaming facility, as did the State restricting the number of gaming device licenses available under the 1999 Compact. As mentioned in Section IV, *supra*, one of the last minute changes to the 1999 Compact was the insertion of a convoluted license pool formula for determining the number of slot machines each tribe individually, and all signatory tribes in the aggregate, could operate under the terms of the agreement. *See, e.g., Colusa I,* 629 F. Supp. 2d at 1096. The State's negotiator revealed this language to the chairmen of the signatory tribes on the evening before the legislative recess, and multiple tribal witnesses testified in federal lawsuits that the State's negotiator refused to explain the meaning of the language either *en mass* or during individual discussions later on that night at the State Capitol. *See, e.g., Coyote Valley II,* 331 F.3d at 1104; *Colusa I,* 629 F. Supp. 2d at 1111.

99. Section 4 of the 1999 Compact contains two sections for calculating the number of slot machines a signatory tribe can operate. The first section – Section 4.3.1 – establishes the baseline machine entitlement and explains that a tribe can start out with an allotment of machines equal to the greater of the number of machines the tribe operated on September 1, 1999 (a date immediately before the execution of the 1999 Compacts) or 350:

> Sec. 4.3. Authorized number of Gaming Devices.
> Sec. 4.3.1. The Tribe may operate no more Gaming Devices than the larger of the following:
> (a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or
> (b) Three hundred fifty (350) Gaming Devices.

100. From there, Section 4.3.2.2(a) allows a signatory tribe to increase its baseline machine entitlement up to a maximum of 2,000 by obtaining machine-specific licenses from a statewide pool. However, rather than identify the total number of available licenses, subsection (a)(1) determines the size of the pool according to a convoluted

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

formula that provides:

> The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1.

101. According to the ensuing subsection (a)(3), the licenses created by Section 4.3.2.2(a)(2) would be available to the signatory tribes during a competitive draw process overseen by a "Trustee." A license draw would have a structure similar to a worst-to-first professional sports draft, whereby the smallest gaming tribes would have an opportunity to go first and request up to a certain number of licenses before larger gaming tribes received a turn. At the end of the first round, according to Section 4.3.2.2(e), "[r]ounds shall continue [in the same manner as the first] until tribes cease making draws, at which time draws will be discontinued for one month or until the Trustee is notified that a tribe desires to acquire a license, whichever last occurs."

102. Despite any uncertainty about the actual number of licenses created by section 4.3.2.2(a)(2), the State's negotiator stated in a letter to the State's independent and non-partisan Legislative Analyst's Office on December 3, 1999, shortly after the execution of the compacts, that the license draw process would be overseen by the California Gambling Control Commission ("CGCC") who, in accordance with Section 4.3.2.2(e), would act as a "neutral trustee." In pertinent part, the December 3, 1999 letter from the State's negotiator to the LAO states that:

> The licensing process is facilitated by a pooling arrangement that includes a method of allocating the licenses on a priority basis. Except for foreseeing that the California Gaming Commission may administer the provisions of Section 4.3.2 acting as a neutral Trustee, the State's interest in the statewide cap imposed by Section 4.3.1 are not implicated by Section 4.3.2.

103. Nevertheless, nearly two-and-a-half years into the performance of the 1999 Compacts, and after most gaming tribes had invested tens if not hundreds of millions of dollars in constructing brick-and-mortar casinos, the CGCC unilaterally interpreted the

Section 4.3.2.2(a)(2) license pool formula, selected an admittedly "conservative" and "low end" number, and stated that tribes would have to renegotiate their compacts with the Office of the Governor if they hoped to acquire more licenses once this constrained limit was hit. *See, e.g., Colusa I,* 629 F. Supp. 2d at 1096. The figure of 32,151 licenses chosen by the CGCC was a full 8,050 less than the number of licenses that actually existed in the pool according to the Ninth Circuit. *See Colusa II,* 618 F.3d 1066.

104. Nevertheless, the constrained interpretation issued by the CGCC governed the administration of the license pool from the point in time the Commission made its determination on June 19, 2002 until the United States District Court for the Eastern District of California ordered the State to supply the pool with the 8,050 omitted licenses within forty-five (45) days of the August 19, 2009 entry of judgment date in the *Colusa* litigation. *See Colusa,* 2009 WL 2579051 (E.D. Cal. Aug. 19, 2009).

105. Thus, the license pool was still subject to the artificial limit imposed by the CGCC when Pauma submitted an application to obtain 750 licenses at a December 19, 2003 license draw. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California,* 813 F.3d 1155, 1161 (9th Cir. 2015) ("*Pauma*").

106. Earlier that fall, Pauma had entered into a partnership with Park Place Entertainment to replace the Tribe's temporary tent-based gaming facility with a Caesars branded resort casino. One of the conditions of the agreement was that Pauma increase its machine count from 850 to the 2,000 machine limit of the 1999 Compact so the project would be financially viable. *See Pauma,* 813 F.3d at 1161-62; *Pauma I,* Dkt. No. 197, 14:2-16:8 & 18:28-19:14 (S.D. Cal. Aug. 31, 2012).

107. While the December 19, 2003 license draw should have provided all 750 requested licenses and placed Pauma within 400 machines of its 2,000 machine goal, the CGCC instead only awarded the Tribe 200 licenses, explaining in a December 30, 2003 letter that "[t]he demand for licenses exceeded the available supply and it was therefore not possible to completely fill the Tribe's request for gaming device licenses." *Pauma I,* Dkt. No. 130, 21:8-16 (S.D. Cal. Sept. 9, 2011). As this comment suggests, the December

19, 2003 license draw marked the first time that the license pool of the 1999 Compact became fully depleted according to the CGCC's constrained interpretation of the Section 4.3.2.2(a)(1) formula.

108. The day after Pauma received the December 30, 2003 letter from the CGCC, then-Governor Arnold Schwarzenegger held a conference to announce the appointment of an attorney named Daniel Kolkey to lead the State's efforts to renegotiate the 1999 Compacts.

109. Various newspaper outlets reporting on the conference quoted Kolkey as saying that "[c]learly, we think the current compacts do not provide fair payment to the state for what is a monopoly on Class III (casino-style) gaming" and hence it was "an opportune time to re-examine the tribal-State relationship" and put the parties on a "much more stable course." *Pauma I,* Dkt. No. 130, 21:27-22:8 (S.D. Cal. Sept. 9, 2011).

110. Still needing additional slot machine licenses to comply with the terms of its Caesars deal, Pauma entered into renegotiations with the State and ultimately executed an amendment to its compact ("2004 Amendment") on June 21, 2004. *Pauma I,* Dkt. No. 130, 22:25-26 (S.D. Cal. Sept. 9, 2011).

111. The 2004 Amendment re-conferred the preexisting license rights of the 1999 Compact and in return imposed heightened regulatory and monetary burdens on Pauma.

112. As to the former, one of the many regulatory changes in the 2004 Amendment altered the method for conducting representative elections under the TLRO from the standard secret ballot process of the NLRA to a card check procedure that does away with the ballot privacy rights of the casino employees and enables the Union to become the bargaining representative if it can successfully coerce or other convince fifty percent (50%) of the eligible employees into handing over their authorization cards.

113. Turning to the new monetary burdens, the 2004 Amendment increased the total amount of revenue sharing that Pauma had to pay for the right to operate 1,050 machines by 2,460%. Under the 1999 Compact, the annual revenue sharing fee for 1,050 machines is $315,000, all of which goes into the Revenue Sharing Trust Fund – an

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

account designed to provide each limited and non-gaming tribe in the State with $1.1 million in annual financial support. A single fee under the 1999 Compact became two under the 2004 Amendment, with one requiring Pauma to pay a flat fee of $2,000,000 into the RSTF and another directing $5,750,000 into what the State ultimately admitted was the General Fund. *See Rincon Band of Luiseno Mission Indians of Rincon Reservation v. Schwarzenegger,* 602 F.3d 1019, 1034 (9th Cir. 2010) (explaining general fund revenue sharing is not an authorized subject of negotiation under IGRA). The combined annual RSTF and General Fund fees would rise from $7,750,000 to $17,075,000 in the event that Pauma increased its device count to the 2,000 machine figure targeted in its development plans. The corresponding annual fee under the 1999 Compact is $3,075,000 in wholly RSTF payments.

114. On top of these newfound fees, Section 10.8.8 of the 2004 Amendment also required Pauma to enter into an intergovernmental agreement with the County of San Diego to mitigate the externalities of its planned expansion and to cover the costs of "law enforcement, fire protection, emergency medical services, [ ] any other public services… provided by the County[,]" a gambling addiction program, and any adverse effects of the project. The intergovernmental agreement Pauma ultimately executed imposed $38 million in infrastructure expenditures to largely off-reservation county roads and annual payments of, *inter alia,* $400,000 for sheriff service, $40,000 for the prosecution of casino-related crime, and $200,000 for a gambling addiction program. *Pauma I,* Dkt. No. 130, 24:21-28 (S.D. Cal. Sept. 9, 2011).

## VIII. PAUMA SUFFERS FINANCIAL DURESS UNDER THE 2004 AMENDMENT

115. The $5,750,000 General Fund revenue sharing fee of the 2004 Amendment went into effect upon the approval of the agreement by the Assistant Secretary of Indian Affairs. *See* 25 U.S.C. § 2710(d)(8). However, the full $2,000,000 RSTF fee had a delayed start date, which meant Pauma paid a fractional amount up until the end of the first quarter of 2008, after which the Tribe was obligated to pay $500,000 per quarter for the remainder of the agreement.

116. Within eight months of paying on a schedule that required $2,000,000 in RSTF payments and $7,750,000 in total revenue sharing payments to the State on an annual basis, Pauma laid off 15.1% of its casino workforce in order to eliminate roughly $2,174,000 in salary costs.

117. The reduced operating expenses helped prevent financial catastrophe, but Pauma still found itself unable to stay current on its revenue sharing fees, falling behind on at least one quarterly general fund payment and two quarterly RSTF payments (*i.e.*, a total of $2,437,500) by the end of the second quarter of 2009 – or less than a year after the date of the aforementioned layoffs.

118. As Pauma became delinquent on its revenue sharing payments, the Eastern District of California issued its dispositive order in *Colusa* that disclosed for the first time that the State had grossly miscalculated the number of slot machine licenses available under the 1999 Compacts. *See Colusa I,* 629 F. Supp. 2d at 1113.

119. After learning of the misrepresentation regarding the size of the license pool, Pauma filed a complaint with the Southern District of California on September 4, 2009 in order to stave off any further reductions in force – requesting rescission of the 2004 Amendment and restitution of all the heightened revenue sharing fees paid thereunder. *See Pauma I,* Dkt. No. 1 (S.D. Cal. Sept. 4, 2009).

120. The district judge soon thereafter granted Pauma a preliminary injunction reducing the revenue sharing fees of the 2004 Amendment to the prior rates of the 1999 Compact after finding the Tribe was entitled to 2,000 machines under the original agreement from the get go and had "made a very, very strong showing of the likelihood that [it would] prevail" in the case. *Pauma I,* Dkt. No. 56, 6:6-11 & 14:23-15:2 (S.D. Cal. May 13, 2010).

121. By the time the injunction order took effect, Pauma had paid the State an extra $36,235,147.01 in revenue sharing under the 2004 Amendment. *See Pauma,* 813 F.3d at 1163.

///

31         Case No.: _____

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

## IX. THE UNION INVOKES THE "BINDING" AND "EXCLUSIVE" DISPUTE RESOLUTION PROCESS OF THE TLRO

122. Despite the above financial hardships, neither the Union nor any employee filed a single unfair labor practice charge against Casino Pauma during its first eleven years of operation.

123. As the district court proceedings entered the summary judgment stage and the continued validity of the card check provisions of the 2004 Amendment came into doubt, the Union notified Pauma of its first alleged unfair labor practice on May 25, 2012 and "submit[ted] the dispute to binding dispute resolution" in accordance with the terms of the TLRO. The union ended its May 25, 2012 letter by informing Pauma that "[t]he first level of binding dispute resolution is submission to a designated tribal forum" and that such body shall attempt to "resolve the dispute within thirty (30) working days."[19]

124. An attorney named Kristin Martin, who works alongside McCracken at the law firm of Davis, Cowell & Bowe that has represented the Union since before the battle over Proposition 5 in *HERE v. Davis*, transmitted a second letter in the dispute resolution process – this time to the State's Department of Personnel Administration – on July 12, 2012. Within this letter, Martin explained that the meet-and-confer process with Pauma did not resolve the dispute to the Union's satisfaction and she was thus "submit[ting] the dispute to the second level of binding dispute resolution" and requesting that the State "promptly appoint an arbitrator from the Tribal Labor Panel to hear this dispute." The outset of the letter laid out the basis for her request, citing the terms of the TLRO and explaining that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism [in the agreement]."[20]

125. On August 4, 2012, the Assistant Chief Counsel for the State's Department of

[19] A true and correct copy of the May 25, 2012 letter from the Union to the "Tribal Leadership of Pauma Band of Luiseno Indians" is attached hereto as **Exhibit 19**.

[20] A true and correct copy of the July 12, 2012 letter from Kristin Martin, the Union's legal counsel, to the State's Department of Personnel Administration is attached hereto as **Exhibit 20**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

Human Resources e-mailed counsel for both the Union and Pauma to "confirm" that they jointly "selected an arbitration panel by striking names," and that such panel would consist of three arbitrators named Sara Adler, Catherine Harris, and John Kagel.[21]

126. After finding out the composition of the panel, Martin subsequently sent notice to all involved parties on November 29, 2012 that she was "withdraw[ing] [the Union's] request for arbitration in this matter."[22]

127. The hearing on Pauma's motion for summary judgment in its compact dispute against the State took place the following day, on November 30, 2012. *See Pauma I*, Dkt. No. 225 (S.D. Cal. Dec. 11, 2012) (transcript for the hearing).

## X. THE UNION CIRCUMVENTS THE TLRO AND FILES A BARRAGE OF NINE CLAIMS DIRECTLY WITH THE NLRA AFTER THE DISTRICT COURT GRANTS SUMMARY JUDGMENT IN PAUMA'S FAVOR

128. Relations between Pauma and the Union remained calm until the district court granted summary judgment in favor of Pauma the following spring, on March 18, 2003, and explained that the Tribe was "entitled to complete rescission of the 2004 Amendment," including the card check revisions to the TLRO therein. *See Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 2013 U.S. Dist. LEXIS 188153, *55 (S.D. Cal. 2013).

129. Dissatisfied with the change to the rules for representational elections, the Union tried to drum up support for its desired position as the bargaining representative for the casino employees by first going to the media. After inviting the San Diego Union Tribune to a staged rally on April 17, 2013, one of the lead organizers for the Union told the reporter in attendance that management at Casino Pauma was not "respecting" the Union's efforts to organize the service employees through the card check procedures of

---

[21] A true and correct redacted copy of the August 4, 2012 e-mail from California Department of Human Resources Assistant Chief Counsel Paul Starkey entitled "Pauma Band of Mission Indians and UNITE HERE" is attached hereto as **Exhibit 21**.

[22] A true and correct copy of the November 29, 2012 letter from Martin to Patrick Tatum of the American Arbitration Association is attached hereto as **Exhibit 22**.

Case No.: _____
COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

the 2004 Amendment, which had just been rescinded.[23]

130. The same Union organizer then made her pitch on why Union representation was needed, explaining "[t]he Pauma workers said they haven't gotten a raise in at least four years[ ] [and] are pinched by rising health-care costs."

131. After describing how "Pauma workers have health benefits, time off and a retirement account with an employer match," the Union-Tribune article proceeded to interview two Casino Pauma employees present at the rally to get their thoughts on the status of employee rights.

132. Speaking exclusively through a translator, the first employee, Alicia Andaluz, explained that she was "a cook in the casino's pizza restaurant" who had a "$16 hourly salary," but nevertheless struggled to pay "$260 a month for health insurance for her family" of undisclosed size.

133. The second employee was a maintenance worker named Martin Loya who earned $20.70 an hour and simply commented on the "different changes that [Casino Pauma had] gone through" over the course of the prior years, as "it's had its ups and it's had its downs."

134. After failing to generate an upswell of public support for its position, the Union then abandoned the "binding dispute resolution mechanism" of the TLRO that Martin acknowledged controlled in her July 12, 2012 letter to the State Department of Personnel Administration and began filing one unfair labor practice charge after the next with the NLRB.

135. All told, the Union has filed *nine* separate unfair labor practice charges against Casino Pauma since the date the district judge issued its summary judgment order granting rescission of the 2004 Amendment in the Tribe's lawsuit against the State. *See Casino Pauma,* Nos. 21-CA-103026, 21-CA-114433, 21-CA-125450, 21-CA-126026, 21-CA-126528, 21-CA-131428, 21-CA-161239, 21-CA-161598, and 21-CA-161832

---

[23] A true and correct copy of the April 17, 2013 San Diego Union-Tribune article entitled "Pauma casino workers aim to unionize" is attached hereto as **Exhibit 23**.

(NLRB).[24] The individual who filed these charges on behalf of the Union and declared to the veracity of the information contained therein under penalty of fine and imprisonment was none other than Kristin Martin.

136. Since the Union was unable to drum up public support generally through the media, the majority of these charges deal with providing employee sympathizers with arguably excessive solicitation rights so they can communicate the Union's message directly to customers on Pauma property. For instance, one charge in particular alleged that Casino Pauma committed an unfair labor practice by prohibiting employees from boarding shuttle buses in far off locales like Los Angeles so they could solicit support for the Union from captive patrons during the two-plus hour trip to the Pauma reservation.

137. The same charge included a separate sub-charge that further contended Casino Pauma committed an unfair labor practice by not extending employee-to-employee solicitation rules to patrons so employees can solicit customers in non-work, *guest* areas of the casino. During the adjudication of this charge, the counsel for the General Counsel of the NLRB took the position that Casino Pauma's stance was impermissible because employees have the right to approach customers to discuss union issues in *any* guest area of the facility, which explicitly included *public restrooms*.[25] The relevant portion of the counsel for the General Counsel's post-hearing brief states that:

> the Board has long held that gambling casinos, like the one operated by Respondent, are analogous to retail stores when evaluating the legality of no-solicitation/no-distribution rules. … While solicitations/distributions may be banned in gambling areas (a space that the Board equates with a retail store's selling floor) prohibiting this activity in other areas such as the public restrooms is unlawful.

138. The charges advancing these solicitation issues are currently pending before

---

[24] True and correct copies of the nine unfair labor practice charges the Union filed against Casino Pauma with the NLRB are attached hereto as **Exhibit 24**.

[25] A true and correct copy of excerpted portions of the Counsel for the General Counsel's Post-Hearing Brief in NLRB case numbers 21-CA-125450, 21-CA-126528, and 21-CA-131428 is attached hereto as **Exhibit 25**.

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

the Ninth Circuit after the NLRB adopted the counsel for the General Counsel's position *en toto*. *See Casino Pauma v. NLRB,* Nos. 16-70397 & 16-70756 (9th Cir. filed on Feb. 9, 2016 & Mar. 21, 2016). The Union has intervened in the review proceedings and is represented by a triumvirate of attorneys from Davis, Cowell & Bowe that once again includes both McCracken and Martin. *See Casino Pauma,* No. 16-70397, Dkt. No. 4 (9th Cir. Feb. 17, 2016).

139. Another similar solicitation-based charge against Casino Pauma is currently pending before the NLRB. *See Casino Pauma,* No. 21-CA-161832 (NLRB filed on Oct. 13, 2015). Again, the legal representation for the Union in this administrative proceeding is Martin and other attorneys from her firm Davis, Cowell & Bowe.

140. The Union's decision to circumvent the expedient and cost-effective "binding dispute resolution" arbitration process of the TLRO – which it contracted to follow – in favor of filing one charge after the next with the NLRB has caused Pauma to incur, in an amount to be ascertained, at least $400,000 in legal fees and expenses, excluding any fees or costs associated with the instant suit or the briefing in the pending Ninth Circuit appeal.

141. Through Martin and its longtime legal counsel at Davis, Cowell & Bowe, the Union now takes the position that the binding arbitration process in the TLRO is not really binding and cannot displace other fora that could have potentially heard the dispute under federal labor laws absent an agreement to resolve the dispute through alternative means. *See, e.g., Unite Here Local 19 v. Picayune Rancheria of Chukchansi Indians,* No. 14-01136, Dkt. No. 16, 6:2-4 (E.D. Cal. Nov. 6, 2014).

142. At present, the Union has still not convinced the requisite thirty percent (30%) of eligible employees to ask for a secret ballot election so they can vote on whether or not the Union (and all of the dues it will demand) should be their bargaining representative.

## XI.   PAUMA AND THE STATE MEET AND CONFER ABOUT THE UNION'S ANTICS

143. The dispute resolution provisions of the 1999 Compact include a requirement that the "Tribe and the State… shall meet and confer in a good faith attempt to resolve [a]

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

dispute through negotiation not later than 10 days after receipt of [a] notice" raising an issue arising under the gaming compact.

144. During the first half of September of 2016, counsel for Pauma discovered the Union – and not the State – was directly responsible for negotiating the TLRO while reviewing old materials at archives maintained by the State of California and the United States.

145. On September 16, 2016, counsel for Pauma relayed a dispute resolution letter to the State about the Union's non-compliance with the TLRO, stating that the Union's course of conduct enabled it to cherry-pick the "fora it would like to use (depending on the make-up and degree of politicization in the NLRA) while also violating the express labor terms set forth within the 1999 Compacts."

146. The parties met at the State Capitol on September 23, 2016. During the meeting, counsel for Pauma again explained the background and its belief that the Union needs to be held to the terms of the TRLO. In response, the Office of the Governor's Senior Advisor for Tribal Negotiations Joginder Dhillon explained that the State did not have an official position on the matter, but he would communicate possible solutions should he think of any.

147. Counsel for Pauma followed-up the dispute resolution meeting at the State Capitol with a summary letter to the State on September 26, 2016, which was the last communication between the parties on the subject as of the filing date for this complaint.

## FIRST CLAIM FOR RELIEF

**[Declaration of Procedure Governing the Resolution of Work Related Disputes (1999 Compact, Addendum B at § 13(a) & 9 U.S.C. § 1 *et seq*. versus 29 U.S.C. § 151 *et seq*.)]**

### [Against all Defendants]

148. Pauma incorporates by reference the preceding allegations as if set forth in full.

149. A claim for declaratory relief is available to determine the enforceability of a

term of a contract (*see Black Gold Marine, Inc. v. Jackson Marine Co.,* 759 F.3d 466, 471 (5th Cir. 1985)), as well as whether a party has waived or otherwise lacks a claimed federal right. *See Superior Oil Co. v. Pioneer Corp.,* 706 F.2d 603, 607 (5th Cir. 1983).

150. There is an emphatic national policy in favor of resolving disputes through arbitration rather than the costly and time-consuming processes of federal administrative and judicial channels – and this policy is reflected in the terms of the Federal Arbitration Act. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 631 (1985). As such, "federal law presumptively favors the enforcement of arbitration agreements." *Harris v. Green Tree Fin. Corp.,* 183 F.3d 173, 178 (3d Cir. 1999).

151. The Ninth Circuit recently issued opinions in which it explained that work related disputes, even those pertaining to concerted activities, are arbitrable, and thus a Union or employee may contract away or "waive" its right to adjudicate unfair labor practice charges against an employer before the NLRB. *See, e.g., Morris,* __ F.3d. __, 2016 U.S. App. LEXIS 15638 at *15-*17 ("An agreement to arbitrate work-related disputes does not conflict with the NLRA. Indeed, federal labor policy favors and promotes arbitration."); *Fallbrook Hosp. Corp. v. Cal. Nurses Assoc./Nat'l Nurses Org. Comm. (CAN/NNOC) AFL-CIO,* 2016 U.S. App. LEXIS 10836, *3 n.1 (9th Cir. 2016) ("We assume for purposes of this disposition that the right to pursue a claim before the NRLB is waivable").

152. In this matter, the express signatories to the 1999 Compact are Pauma and the State. While Pauma took no part in the negotiation of the 1999 Compact, the State spearheaded the effort and drafted the language in the main body of the agreement. *See Colusa I,* 629 F. Supp. 2d at 1115 ("[I]t is undisputed that the State's negotiation team actually drafted the language in the Compact."). Intent on assuming jurisdiction over federal labor law issues at tribal casinos that the NLRA had previously ceded, the State inserted a provision in Section 10.7 of the 1999 Compact requiring the first wave of signatory tribes to sit down with the Union – as the beneficiary who long desired a seat at the negotiating table – and negotiate an agreement that would apply these previously-

inapplicable protections and create an alternate forum for resolving any issues that may arise as a result. The negotiations achieved these twin aims. The substantive protections of the ultimate agreement – the TLRO – mirror the language of the NLRA as well as the antecedent Pala Compact, which the Union said guaranteed the "same type of worker rights at Indian casinos as you would find off-reservation." The only material difference between the TLRO and the NLRA is the creation of the necessary alternate forum to resolve work related disputes. As to that, rather than involve the inaccessible NLRB, Section 13 of the TLRO explains that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein" that involves a meet-and-confer process followed by arbitration before a panel of neutrals "experienced in federal labor law and/or federal Indian law" who are selected through the cooperative action of the parties.

153. The Union invoked this binding arbitration procedure on May 25, 2012, but then abandoned the process after discovering the identities of the individuals who would serve on the arbitration panel. The next time the Union had a grievance it simply circumvented the arbitration process in the TLRO and filed a charge directly with the NLRB – an action it would do *eight* more times following that as part of an orchestrated strategy to disrupt business operations until the Union could unilaterally force its way into becoming the employees' bargaining representative.

154. An actual controversy has arisen and now exists between the parties pertaining to the terms of the 1999 Compact and the governing procedure for resolving work-related disputes – with Pauma arguing for the binding dispute resolution procedure in the TLRO, the Union the NLRA, and the State feigning indifference despite demand-ing that the signatory tribes agree to the TLRO in the first place– which this court has the power to resolve through a declaration of rights.

///

///

///

**SECOND CLAIM FOR RELIEF**

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-103026 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

**[Against UNITE HERE International Union]**

155. Pauma incorporates by reference the preceding allegations as if set forth in full.

156. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

157. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n of Sacramento v. Painters & Decorators Comm. of E. Bay Counties,* 707 F.2d 1067, 1071 (9th Cir. 1983) ("*Painting & Decorating Contrs. Ass'n*")), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA Ins. Corp. v. Royal Bank of Can.,* 706 F. Supp. 2d 380, 396 (S.D.N.Y. 2009) ("*MBIA*")); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp. v. AB Sciex Pte. Ltd.,* 803 F. Supp. 2d 270, 273 (S.D.N.Y. 2011) (quoting *MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC,* 268 F.3d 58, 61 (2d Cir. 2001) ("*Mag Portfolio*")).

158. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the

NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., Unite Here Int'l Union v. Pala Band of Mission Indians*, 583 F. Supp. 2d 1190 (S.D. Cal. 2008) ("*UNITE HERE v. Pala*").

159. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

160. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on April 16, 2013, the Union circumvented the process by filing case number 21-CA-103026 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum from the date of filing till July 20, 2016 or thereabouts.

161. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

///

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

### THIRD CLAIM FOR RELIEF

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-114433 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

### [Against UNITE HERE International Union]

162. Pauma incorporates by reference the preceding allegations as if set forth in full.

163. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

164. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

165. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

166. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

167. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on September 30, 2013, the Union circumvented the process by filing case number 21-CA-114433 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum from the date of filing till July 20, 2016 or thereabouts.

168. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

## FOURTH CLAIM FOR RELIEF

### [Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-125450 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]

### [Against UNITE HERE International Union]

169. Pauma incorporates by reference the preceding allegations as if set forth in

full.

170. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

171. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

172. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

173. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

174. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on March 28, 2014, the Union circumvented the process by filing case number 21-CA-125450 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum (and the reviewing federal court) from the date of filing till at least the filing date of this complaint.

175. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

### FIFTH CLAIM FOR RELIEF
**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-126026 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

### [Against UNITE HERE International Union]

176. Pauma incorporates by reference the preceding allegations as if set forth in full.

177. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

178. A cause of action for breach of contract may arise from a party's non- or

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

179. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

180. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

181. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on April 7, 2014, the Union circumvented the process by filing case number 21-CA-126026 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum from the date of filing till June 5, 2014.

182. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

## SIXTH CLAIM FOR RELIEF

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-126528 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

### [Against UNITE HERE International Union]

183. Pauma incorporates by reference the preceding allegations as if set forth in full.

184. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

185. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or

(3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

186. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

187. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

188. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on April 11, 2014, the Union circumvented the process by filing case number 21-CA-126528 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum (and the reviewing federal court) from the date of filing till at least the filing date of this complaint.

189. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

## SEVENTH CLAIM FOR RELIEF

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-131428 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

**[Against UNITE HERE International Union]**

190. Pauma incorporates by reference the preceding allegations as if set forth in full.

191. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

192. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

193. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

194. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

195. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on June 24, 2014, the Union circumvented the process by filing case number 21-CA-131428 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum (and the reviewing federal court) from the date of filing till at least the filing date of this complaint.

196. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

///

///

///

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

### EIGHTH CLAIM FOR RELIEF

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-161239 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

### [Against UNITE HERE International Union]

197. Pauma incorporates by reference the preceding allegations as if set forth in full.

198. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

199. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

200. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any

number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

201. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

202. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on October 2, 2015, the Union circumvented the process by filing case number 21-CA-161239 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum from the date of filing till January 4, 2016.

203. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

### NINTH CLAIM FOR RELIEF

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-161598 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

**[Against UNITE HERE International Union]**

204. Pauma incorporates by reference the preceding allegations as if set forth in

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

full.

205. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

206. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

207. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

208. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS

the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

209. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on October 7, 2015, the Union circumvented the process by filing case number 21-CA-161598 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum from the date of filing till January 4, 2016.

210. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

### TENTH CLAIM FOR RELIEF

**[Partial Breach/Violation of the 1999 Compact – Filing of NLRB Case Number 21-CA-161832 (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]**

**[Against UNITE HERE International Union]**

211. Pauma incorporates by reference the preceding allegations as if set forth in full.

212. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

213. A cause of action for breach of contract may arise from a party's non- or

imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

214. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

215. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such

reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

216. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, on October 13, 2015, the Union circumvented the process by filing case number 21-CA-161832 directly with the NLRB instead, proceeding to litigate the charge in that administrative forum from the date of filing till at least the filing date of this complaint.

217. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages.

### ELEVENTH CLAIM FOR RELIEF

### [Breach/Violation of the 1999 Compact – Repudiation/Anticipatory Repudiation of Section 13 of the TLRO (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]

### [Against UNITE HERE International Union]

218. Pauma incorporates by reference the preceding allegations as if set forth in full.

219. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

220. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its

participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

221. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

222. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American Academy of Arbitrators.

223. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, the Union has circumvented this process on nine separate occasions by filing charges directly with the NLRB in lieu of arbitration. On top of which, the Union has recently taken the position in another suit that it is not bound to

follow the binding dispute resolution process in the TLRO and can instead use alternate fora that may be available under federal labor laws absent an arbitration agreement. *See Unite Here Local 19,* Dkt. No. 16, 6:2-4 (E.D. Cal. Nov. 6, 2014).

224. The continued insistence by the Union that it will not abide by the binding arbitration process in Section 13 of the TLRO will inflict irreparable injury upon Pauma that monetary damages will not adequately redress, but this court can rectify through an order of specific performance.

## TWELFTH CLAIM FOR RELIEF

### [Breach of the Implied Covenant of Good Faith and Fair Dealing – Foregoing Reasons in Claims Two through Eleven (Restatement (Second) of Contracts and other General Principles of Federal Contract Law)]

### [Against UNITE HERE International Union]

225. Pauma incorporates by reference the preceding allegations as if set forth in full.

226. The 1999 Compact and accompanying addenda – of which the TLRO is one – comprise a valid agreement that is in effect until at least December 31, 2020, and June 30, 2022 if the parties have not "agreed to extend this Compact or enter into a new compact" by the original expiration date.

227. The covenant of good faith and fair dealing is implied in every contract to prevent one party from unfairly frustrating the other party's rights to the benefits of the agreement. *See Britz Fertilizers, Inc. v. Bayer Corp.,* 665 F. Supp. 2d 1142, 1166 (E.D. Cal. 2009). This overriding goal of preventing frustrating behaviors means the covenant prohibits subterfuges and evasions even if the actor believes them to be justified (*see* Restatement (Second) of Contracts § 205 cmt. d (1981)), and mandates that any discretionary power be carried out in good faith and in accordance with fair dealing. *See Cal. Lettuce Growers v. Union Sugar Co*., 45 Cal.2d 474 (1955).

228. A cause of action for breach of contract may arise from a party's non- or imperfect performance of a contractual obligation. *See, e.g.,* Restatement (Second) of

Contracts § 235 (1981). A breach claim may be brought against a non-signatory of the agreement if, for amongst other reasons, (1) the contract arose pursuant to a federal statute and the "resolution of the lawsuit [is] focused upon and governed by the terms of the contract" (*see Painting & Decorating Contrs. Ass'n,* 707 F.2d at 1071), (2) the party has manifested an intent to be bound by the contract, which can be shown by its participation in the negotiations of the agreement (*see MBIA,* 706 F. Supp. 2d at 396); or (3) the party "knowingly accepted the benefits of an agreement." *Life Techs. Corp.,* 803 F. Supp. 2d at 273 (quoting *MAG Portfolio,* 268 F.3d at 61).

229. In this matter, counsel for Pauma discovered that the Union negotiated the TLRO while conducting research at archives for the State of California and United States during the first half of September of 2016. The TLRO arose at a point in time when the NLRB did not exert jurisdiction over Indian tribes, and contained the same employee protections that were in the NLRA and the antecedent Pala Compact, which the Union said would guarantee the "same type of worker rights at Indian casinos as you would find off-reservation." The Union then accepted the benefit of the TLRO by bringing any number of unfair labor practice charges under the terms of the agreement in an (albeit sometimes successful) effort to force its way in to becoming the bargaining representative for service employees at various tribal casinos in California. *See, e.g., UNITE HERE v. Pala*, 583 F. Supp. 2d 1190.

230. Under the TLRO, charges related to unfair labor practices or other issues are directed to arbitration though a "binding dispute resolution mechanism" in Section 13 of the agreement. This section begins by specifying that "[a]ll issues shall be resolved exclusively through the binding dispute resolution mechanism herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution." While the first stage of the process is simply a meet-and-confer with the responsible tribal body, the second stage is binding arbitration before a panel of neutrals experienced in federal Indian and labor law and chosen from such reputed providers as the Federal Mediation and Conciliation Service and the American

Academy of Arbitrators.

231. Despite negotiating and agreeing to the "binding dispute resolution mechanism" in Section 13 of the TLRO, the Union circumvented the process by filing nine separate cases directly with the NLRB instead as part of a "scorched earth" strategy designed to disrupt Pauma's business in retaliation for refusing to recognize the card check election procedures of a then-rescinded and nonexistent compact amendment. Pursuing these nine charges through the federal administrative channels in lieu of arbitration has frustrated the bargain that Pauma and the other signatory tribes to the 1999 Compact struck with the Union, and it would still amount to a breach of the implied covenant of good faith and fair dealing *even if* the Union retained some right to present work related claims to the NLRB. In such a case, the covenant would still dictate that the Union first proceed through the binding arbitration process set forth within the TLRO before involving the NLRB.

232. Bypassing the cost-effective and expedient binding dispute resolution process in the TLRO has caused Pauma to incur substantial legal expenses and other costs, which this court has the power to rectify through an award of damages and/or specific performance.

## PRAYER FOR RELIEF

WHEREFORE, the Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation prays as follows:

1. That the Court declare that the binding dispute resolution process that resolves "all issues" under the TLRO is valid and enforceable against all parties to the 1999 Compact (including the Union), and that the Union has contracted away or otherwise waived its right to litigate such work related issues before the NLRB;

2. That the Court hold that the Union partially breached the 1999 Compact on nine separate occasions by filing that number of work related charges directly with the NLRB in lieu of the binding arbitration process in the TLRO, and further order the Union to pay damages to Pauma in an amount to be proven to cover the costs involved in litigating

1  such disputes;

2  3. That the Court hold that the Union is continuing to breach the 1999 Compact by

3  insisting on litigating work related disputes with the NLRB in lieu of the binding

4  arbitration process in the TLRO, and further order the Union to specifically perform the

5  terms of the ordinance;

6  4. That the Court hold that the Union has and is continuing to breach the implied

7  covenant of good faith and fair dealing underlying 1999 Compact by litigating work

8  related disputes before the NLRB in lieu of the binding arbitration process in the TLRO,

9  and further order remedies akin to those in paragraphs 2 and 3 above;

10  5. That the Court award any other relief that may be available under the waivers in

11  Section 9.4(a) of the 1999 Compact or Section 98005 of the Government Code; and

12  6. That the Court award Pauma its costs of suit and attorneys' fees as allowed by

13  law or equity.

14  RESPECTFULLY SUBMITTED this 27th day of October, 2016

15

16  PAUMA BAND OF MISSION INDIANS

17  By: */s/ Kevin M. Cochrane*

18  Cheryl A. Williams

19  Kevin M. Cochrane
   caw@williamscochrane.com
   kmc@williamscochrane.com

20  WILLIAMS & COCHRANE, LLP
   28581 Old Town Front Street

21  Temecula, CA 92590
   Telephone: (619) 793-4809

22

23

24

25

26

27

28

COMPLAINT OF THE PAUMA BAND OF MISSION INDIANS