1
2
3
4
5
6
7
8                 **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10
11   PAUMA BAND OF LUISENO              Case No. 16-cv-2660-BAS-AGS
     MISSION INDIANS OF THE
     PAUMA AND YUIMA                    **ORDER GRANTING:**
12   RESERVATION,
                                        **(1) DEFENDANTS STATE OF**
13                       Plaintiff,     **CALIFORNIA AND EDMUND G.**
                                        **BROWN, JR.'S MOTION TO**
14        v.                            **DISMISS; AND**

15   UNITE HERE INTERNATIONAL           **(2) DEFENDANT UNITE HERE**
     UNION; STATE OF CALIFORNIA;        **INTERNATIONAL UNION'S**
16   EDMUND G. BROWN, JR.,              **MOTION TO DISMISS**

17                       Defendants.    **[ECF Nos. 34, 36]**

18
19
20                         **OVERVIEW**

21        This action is an offshoot from a bitter labor dispute between a union and a

22   casino operator.  Plaintiff Pauma Band of Luiseno Mission Indians of the Pauma &

23   Yuima Reservation ("Pauma" or "Tribe") is a federally-recognized tribe that operates

24   Casino Pauma on its reservation in Northern San Diego County.  "About 2,900

25   customers visit Casino Pauma each day," and the Casino "employs 462 employees."

26   *Pauma v. N.L.R.B.*, 888 F.3d 1066, 1070 (9th Cir. 2018).

27        In 2013, Defendant UNITE HERE International Union ("Union"), which

28   represents service and manufacturing employees, began an organizing drive at

                              – 1 –

Casino Pauma. The Tribe claims this organizing effort involved a series of "antics," including the Union inviting *The San Diego Union Tribune* to a "staged rally." (Second Am. Compl. ("SAC") ¶¶ 151–54, 45:26, ECF No. 33.) There, the Tribe highlights that a casino employee allegedly spoke "exclusively through a translator" and "explained that she was 'a cook in the casino's pizza restaurant' who had a '$16 hourly salary,' but nevertheless struggled to pay '$260 a month for health insurance for her family' of undisclosed size." (*Id.* ¶ 154.)

As another tactic, Pauma alleges the Union "went berserk," filing a flurry of unfair labor practice charges against Casino Pauma with the National Labor Relations Board ("NLRB"). (SAC ¶ 5.) Pauma claims that "the one thing that all of these charges have in common is that they seek to turn Casino Pauma into a soapbox for the Union, whereby sympathetic employees can communicate the Union's message *directly to customers* in any 'guest area' of the gaming facility or associated property—whether that is within a shuttle bus, across a restaurant table, inside a family changing room, or underneath a bathroom stall." (*Id.* (emphasis in original).)

Ultimately, however, the Union's charges led to the General Counsel of the NLRB filing several administrative complaints against Casino Pauma for unfair labor practices. *Pauma v. N.L.R.B.*, 888 F.3d at 1071. The General Counsel's allegations included that Casino Pauma had "interfere[ed] with the distribution of union literature by employees near the public entrance to [the] casino," "threaten[ed] employees with discipline for distributing union literature at that location," and "interrogat[ed] an employee about her union activity." *Id.* at 1071 n.1. After a three-day trial, an administrative law judge determined "Casino Pauma violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, in most of the ways the General Counsel alleged," and the NLRB affirmed. *Id.* at 1071; *see also Casino Pauma (Casino Pauma II)*, 363 N.L.R.B. No. 60 (Dec. 3, 2015).

Then, during the pendency of this action, the Tribe and the Union continued their dispute in the Court of Appeals. The NLRB filed a petition for enforcement of

its order against Casino Pauma in the Ninth Circuit, the Tribe filed a separate petition for review, and the Union intervened in opposition to Pauma. *See Pauma v. N.L.R.B.*, 888 F.3d at 1072. The Ninth Circuit rejected the Tribe's challenges and granted the NLRB's petition for enforcement. *Id.* at 1085. In doing so, the Ninth Circuit upheld the NLRB's "determination that tribe-owned casinos can be NLRA-covered employers," and the court concluded "the NLRA governs the relationship between Casino Pauma and its employees." *See id.* at 1079.

In the offshoot before this Court, Pauma alleges that by filing the series of unfair labor practice charges directly with the NLRB, the Union has skirted a binding dispute resolution process. (SAC ¶¶ 5, 150–64.) This dispute resolution process is found in a tribal labor ordinance that the State required Pauma to enact to engage in casino-style gaming. (*Id.* ¶ 2 & n.1.) The Tribe requests that this Court rein in the Union by ordering it to comply with the dispute resolution process and pay Pauma "the costs involved in litigating" the labor charges filed with the NLRB. (*Id.* Prayer ¶¶ 2–4.) The Union, on the other hand, argues this ancillary labor dispute is an "improper collateral attack on NLRB proceedings," an effort "to circumvent Ninth Circuit review" of the NLRB's order discussed above, and the product of "procedural gamesmanship." (ECF No. 34-1.)

It appears the reason the Tribe and the Union's dispute has spilled over into this Court, however, is because the Tribe is also suing two other defendants—the State of California and Governor Edmund G. Brown, Jr. (collectively, "State"). Pauma tries to pull the State into the fray by alleging the State has failed to take "reasonable efforts to ensure" the Union would comply with the dispute resolution process, including by failing to "direct[] [the Union] to first file any such unfair labor practice claims through" that process, as opposed to proceeding directly before the NLRB. (SAC ¶ 285.) The State moves to dismiss for lack of subject matter jurisdiction, arguing Pauma fails to demonstrate a justiciable controversy between these two parties. (State's Mot., ECF No. 36-1.) The Union similarly moves to

dismiss for lack of jurisdiction. (Union's Mot., ECF No. 34-1.) Pauma opposes.[1] (Opp'n to State's Mot., ECF No. 38; Opp'n to Union's Mot., ECF No. 37.)

Pauma's detailed pleading interweaves a retelling of the history of tribal-state compacting in California, exposition on the NLRB's jurisdictional jurisprudence, and colorful criticisms of the Union's efforts to organize workers at Casino Pauma. But the Court is unconvinced by Pauma's attempt to construct a justiciable controversy against the State to invoke federal jurisdiction. At most, Pauma's factual allegations demonstrate the State has declined to participate in the Tribe's labor dispute, has taken "no official position on the matter," and has rejected Pauma's request to voluntarily agree "to be bound by a judgment issued by the Court in this case." (SAC ¶¶ 168, 171.) These allegations do not reveal an actual controversy between Pauma and the State. And the Court discerns no independent basis to exercise jurisdiction over the Tribe's remaining declaratory relief and breach of contract claims against the Union. Consequently, for the following reasons, the Court **GRANTS** the State's and the Union's motions to dismiss.

## BACKGROUND[2]

As will be seen, Pauma claims this case turns on a model tribal ordinance that is an addendum to a tribal-state gaming compact. Pauma and the State of California entered into this gaming compact under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–21. Hence, the Court first provides a brief overview of IGRA before expanding upon the Tribe's allegations.

## I. Indian Gaming Regulatory Act

"In 1988, Congress attempted to strike a delicate balance between the sovereignty of states and federally recognized Native American tribes by passing

---

[1] The Court finds the State's and the Union's motions suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).

[2] Pauma's Second Amended Complaint presents a fifty-one page account of the events underlying this action. (SAC ¶¶ 1–186.) The Court provides only a synopsis of the Tribe's allegations here.

– 4 –

IGRA." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v. California*, 813 F.3d 1155, 1160 (9th Cir. 2015). IGRA's general purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1).

To accomplish this purpose, IGRA "creates a framework for regulating gaming activity on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2028 (2014) (citing 25 U.S.C. § 2702(3)). "The Act divides gaming on Indian lands into three classes—I, II, and III." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996). IGRA then "assigns authority to regulate gaming to tribal and state governments depending on the class of gaming involved." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 949 (9th Cir. 2015) (en banc).

The final category—Class III gaming—"includes the types of high-stakes games usually associated with Nevada-style gambling." *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1097 (9th Cir. 2003) ("*Coyote Valley*"). "As a result, Class III gaming is subjected to the greatest degree of control under IGRA's regulations." *Pauma v. California*, 813 F.3d at 1060. A tribe may conduct Class III gaming "only if such activities are conducted pursuant to a Tribal-State Compact entered into by the tribe and a state that permits such gaming, and the Compact is approved by the Secretary of the Interior." *Id.* (citing *Coyote Valley*, 331 F.3d at 1097); *see also* 25 U.S.C. § 2710(d)(1), (3)(B). Thus, IGRA contemplates that a tribe and the relevant state shall negotiate to enter into a compact that (i) permits Class III gaming and (ii) may address various regulatory issues related to this type of gaming. *See* 25 U.S.C. § 2710(d)(3)(A), (C) (identifying the permissible gaming compact topics to include standards for "maintenance of the gaming facility" and "licensing").

## II. Pauma's Compact with the State

Historically, Pauma's members "relied upon subsistence farming and federal funding to stave off destitution." (SAC ¶ 111.) In 2000, Pauma sought to improve

its members' circumstances by opening a tribal gaming facility. (*See id.* ¶¶ 111–16.) To do so, the Tribe entered into a tribal-state gaming compact with the State of California under IGRA. (Tribal-State Compact Between the State of California and the Pauma Band of Mission Indians ("Pauma Compact"), SAC Ex. 1, ECF No. 33-1.)

The terms of the Pauma Compact are not unique. In 1999, the State of California and numerous tribes negotiated a form compact—the "1999 Compact." *See Coyote Valley*, 331 F.3d at 1101–07 (detailing the course of negotiations). Pauma's agreement is an executed version of the 1999 Compact. (*See* SAC ¶¶ 68–85, 114.) When the State and various tribes were negotiating the 1999 Compact, a point of contention was the collective bargaining rights of employees at tribal gaming facilities. (*Id.* ¶¶ 69–76.) The Union opposed the approval of any gaming compacts that did not include desired protections for workers. (*Id.* ¶ 69.) The State's negotiator believed the issue of collective bargaining rights could be "work[ed] out directly with the Union." (*Id.* ¶ 72.) However, the initial discussions between the negotiating tribes and the Union "were unfruitful" because of the Union's efforts to invalidate a voter initiative concerning tribal gaming. (*Id.*)

As the negotiation deadline for the 1999 Compact neared, the State presented the tribes with its "final compact offer." (SAC ¶ 74.) "Since the tribes had been unable to agree upon labor relations provisions with the Union," the State's offer included a provision requiring the tribes to provide an "agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise." (SAC ¶ 75; *see also* Pauma Compact § 10.4.) If the tribes failed to do so by a set deadline, the 1999 Compact provided the agreement would be rendered null and void. (*See* Pauma Compact § 10.4.)

"Fifty-seven tribes participating in the negotiations signed letters of intent to execute the compacts . . . in accordance with the State's request." (SAC ¶ 76.) "With

– 6 –

that, the signatory tribes continued to negotiate collective bargaining rights for casino employees with the Union," with the aim of reaching an agreement by the 1999 Compact's deadline. (*Id.*)

### III. Model Tribal Labor Relations Ordinance

The result of the tribes and union representatives' efforts is the Model Tribal Labor Relations Ordinance dated September 14, 1999 ("Tribal Labor Ordinance" or "Ordinance"). (SAC ¶ 78; *see also* Tribal Labor Ordinance, Attachment to Pauma Compact Add. B, SAC Ex. 1 at 1-50.) The Tribal Labor Ordinance provides that:

> Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

(Tribal Labor Ordinance § 4.) Further, the Ordinance defines unfair labor practices for the tribe and labor organizations. (*Id.* §§ 5–6.) It also provides for alternative dispute resolution. (*Id.* § 13.) Specifically, the Ordinance states:

> All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution.

(*Id.* § 13(a).) If the informal portion of the dispute resolution process is unsuccessful, the tribe and the labor organization are to submit their dispute to arbitration before a mutually agreed upon arbitrator or several arbitrators from a ten-member "Tribal Labor Panel" created under the Tribal Labor Ordinance. (*Id.* § 13(c)(1).) Other topics addressed by the Ordinance include procedures for union elections, access to eligible employees, and decertification of certified unions. (*Id.* §§ 8, 10, 12.)

### IV. Pauma's Adoption of the Tribal Labor Ordinance

Pauma was not one of the tribes that participated in the negotiation of the 1999 Compact and the Tribal Labor Ordinance. (SAC ¶ 115.) Consequently, when Pauma

entered into the Pauma Compact in 2000, the Tribe did so via executing a form version of the 1999 Compact "through a simple exchange of letters with the Office of the Governor." (*Id.* ¶ 114.) Addendum B to the Pauma Compact states:

> In compliance with Section 10.7 of the Compact, the Tribe agrees to adopt an ordinance identical to the Model Tribal Labor Relations Ordinance attached hereto, and to notify the State of that adoption no later than May 5, 2000. If such notice has not been received by the State by May 5, 2000, this Compact shall be null and void. Failure of the Tribe to maintain the Ordinance in effect during the term of this Compact shall constitute a material breach entitling the State to terminate this Compact. No amendment of the Ordinance shall be effective unless approved by the State.

(SAC Ex. 1 at 1-49.) Both the State and Pauma executed Addendum B to the Pauma Compact. (*Id.*) Further, Pauma provided notice to the State that on April 27, 2000, the Tribe "adopted the Tribal Labor Relations Ordinance pursuant to Section 10.7 of the" Pauma Compact—satisfying the condition mentioned in Addendum B above. (*Id.* at 1-51.) Although the Union allegedly negotiated the content of the Tribal Labor Ordinance with other tribes, the Union is not a signatory to the Pauma Compact or its Addendum B containing the Model Tribal Labor Relations Ordinance to be enacted as tribal law. (*Id.* at 1-41, 1-49.) Rather, the tribal-state gaming compact was "entered into on a government-to-government basis by and between" Pauma and the State. (*Id.* at 1-5.)

Accordingly, having entered into the Pauma Compact to satisfy IGRA's requirements to conduct Class III gaming activities, Pauma opened a gaming facility on its reservation in Pauma Valley the following year. (SAC ¶¶ 14, 116.)

## V.    Labor Dispute at Casino Pauma

Over a decade later, the Union engaged in the aforementioned effort to unionize workers at Casino Pauma. (*See* SAC ¶¶ 144–56.) As part of its efforts, the Union allegedly sought to allow Casino Pauma workers to use "card check election procedures" to decide whether to make the Union their representative. (*See id.* ¶¶ 5,

134, 145, 150–51.)  Pauma, however, informed the Union "that any representational effort would have to take place" according to "secret ballot election" procedures contained in the Tribal Labor Ordinance.  (*Id.* ¶ 5.)  Then, on May 25, 2012, a Union director invoked the dispute resolution process under the Tribal Labor Ordinance, and the Union later proceeded to seek appointment of an arbitrator, but the Union subsequently withdrew its request for arbitration under Pauma's Ordinance.  (*Id.* ¶¶ 145–48.)

The Tribe claims the Union then "went berserk, filing *nine* unfair labor practice charges against Pauma directly with the NLRB."  (SAC ¶ 5.)  In doing so, Pauma alleges the Union "abandoned the 'binding dispute resolution mechanism'" contained in the Tribal Labor Ordinance.  (*Id.* ¶ 156.)  And, because the Union has opted to pursue its unfair labor charges against Pauma with the NLRB instead of the dispute resolution process, Pauma claims it has incurred "at least $400,000" in legal fees and expenses."  (*Id.* ¶ 162.)

## VI.    Pauma's Attempt to Involve the State

In September 2016, Pauma's counsel sent a letter to the State of California regarding "the Union's non-compliance with" the Tribal Labor Ordinance.  (SAC ¶ 167.)  In a subsequent meeting at the State Capitol, Pauma's counsel "requested the State's assistance in holding the Union to the terms of the [Tribal Labor Ordinance] or otherwise devising a fix for the solution."  (*Id.* ¶ 168.)  "In response, the Office of the Governor's Senior Advisor for Tribal Negotiations Joginder Dhillon explained that the State did not have an official position on the matter and thus would not get involved at the time, though he would communicate possible solutions should he think of any."  (*Id.*)

## VII.    Pauma's Lawsuit

Pauma filed this action on October 27, 2016, against the State and the Union.  In its initial Complaint, the only claim Pauma pled against the State was for declaratory relief.  (Compl. ¶¶ 148–54, ECF No. 1.)  The Tribe alleged an actual

controversy exists regarding the Tribal Labor Ordinance because Pauma is "arguing for the dispute resolution procedure in the" Ordinance, the Union is arguing for "the NLRA," and the State is purportedly "feigning indifference despite demanding that the signatory tribes agree to the [Tribal Labor Ordinance] in the first place." (*Id.* ¶ 154.)

In Pauma's Second Amended Complaint,[3] Pauma supplements its pleading with allegations arising from a meet-and-confer meeting required by this Court's Standing Order for Civil Cases. (SAC ¶¶ 170–73.) Under this Court's Standing Order, "[a]ny party contemplating the filing of any noticed motion before this Court must first contact opposing counsel to discuss thoroughly—preferably in person—the substance of the contemplated motion and any potential resolution." During such a conference, Pauma alleges "counsel for the State questioned the Court's jurisdiction," including by explaining the State's "perception that Pauma's suit was really one against the Union, which meant that the State should not be a party to the suit especially since Pauma had not alleged a breach of compact claim against the State." (*Id.* ¶ 171.) "Nevertheless, in an attempt to eliminate the need for the State's motion to dismiss, counsel for Pauma agreed to dismiss the State [] from the suit if [it] stipulated to be bound by the order issued by the Court on the declaratory relief claim." (*Id.*) The State declined to "enter into such an agreement in order to secure [its] dismissal from the case." (*Id.*) Based on this conduct, Pauma alleges the State breached the implied covenant of good faith and fair dealing in the Pauma Compact. (*Id.* ¶¶ 280–86.)

In addition, Pauma joins the Union in its declaratory relief claim. (SAC ¶¶ 187–94.) Pauma also pleads a series of claims alleging the Union has purportedly

---

[3] Pauma previously filed a First Amended Complaint, which the State and the Union moved to dismiss while Pauma moved for leave to amend to file a Second Amended Complaint. (ECF Nos. 13–15.) "In light of the liberal policy favoring amendment," the Court granted Pauma's request to amend and deferred consideration of Defendants' challenges to Pauma's action. (ECF No. 32.)

breached the Pauma Compact by not adhering to the dispute resolution process in the Tribal Labor Ordinance that was enacted by Pauma and appended to the Pauma Compact. (*Id.* ¶¶ 195–279.)

The State now moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss Pauma's claims against it for lack of subject matter jurisdiction. (State's Mot. 1:2–25, 5:21–11:6, ECF No. 36.) The Union similarly moves to dismiss Pauma's claims involving the Union. (Union's Mot. 4:13–12:16, ECF No. 34.)[4]

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the jurisdiction of a federal court over the subject matter of the complaint. Fed. R. Civ. P. 12(b)(1). "It is axiomatic that '[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree.'" *Vacek v. U.S. Postal Serv.*, 447 F.3d 1248, 1250 (9th Cir. 2006) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "It is to be presumed that a cause lies outside this limited jurisdiction, and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id.*; *see also Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir. 1996).

## ANALYSIS

### I.     State's Motion to Dismiss

The State argues this Court lacks subject matter jurisdiction because Pauma does not identify a suitable basis for jurisdiction and fails to plead a live, justiciable controversy between the Tribe and the State. (State's Mot. 1:2–25, 5:21–11:6.) Although there is a colorable ground for federal jurisdiction for Pauma's claims against the State, the Court agrees that Pauma does not plead a requisite controversy between these two parties.

---

[4] Both the State and the Union alternatively move under Rule 12(b)(6) to dismiss Pauma's claims for lack of plausibility and under Rule 12(f) to strike certain allegations in the Second Amended Complaint. Because the Court ultimately grants their motions based on a lack of subject matter jurisdiction, the Court does not reach these alternative requests.

## A. Basis for Jurisdiction

Pauma's Second Amended Complaint identifies the following bases for this Court's subject matter jurisdiction:

- The Indian Commerce Clause of the U.S. Constitution, U.S. Const. art I., § 8, cl. 3;

- The Federal Arbitration Act ("FAA"), 25 U.S.C. § 2701 *et seq.*;

- IGRA, 25 U.S.C. § 2701, and "interpretive case law such as *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1055–56 (9th Cir. 1997)";

- Federal question jurisdiction, 28 U.S.C. § 1331;

- Indian tribes jurisdiction, 28 U.S.C. § 1362;

- The Declaratory Judgment Act, 28 U.S.C. § 2201; and

- Section 9.1 of the Pauma Compact.

(SAC ¶ 10.) Many of these items do not provide an independent basis for jurisdiction.[5] The Court focuses on the two interchangeable possibilities that may provide jurisdiction: the federal question statute, 28 U.S.C. § 1331, and the Indian tribes statute, 28 U.S.C. § 1362.

---

[5] These are: (1) the Indian Commerce Clause, (2) the Federal Arbitration Act, (3) the Declaratory Judgment Act, and (4) Section 9.1(d) of the Pauma Compact. First, the Indian Commerce Clause, which grants Congress the authority "[t]o regulate Commerce . . . with the Indian Tribes," does not vest this Court with jurisdiction. *See* U.S. Const. art. I, § 8, cl. 3. The "Indian Commerce Clause makes 'Indian relations . . . the exclusive province of federal law.'" *Seminole Tribe of Fla.*, 517 U.S. at 60 (quoting *County of Oneida v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 234 (1985)). But it alone does not provide jurisdiction here.

Second, although "the Federal Arbitration Act creates federal substantive law requiring the parties to honor arbitration agreements, it does not create any independent federal-question jurisdiction." *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984).

Third, the Declaratory Judgment Act is not an independent basis for jurisdiction because it is "procedural only." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937). This Act "enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950).

Fourth, Section 9.1 of the Pauma Compact does not create jurisdiction. Section 9.1 provides that the parties may resolve a dispute "in the United States District Court where the Tribe's Gaming Facility is located." (Pauma Compact § 9.1.) The parties, however, have "no power to confer jurisdiction on the district court by agreement." *See Morongo Band of Mission Indians v. Cal. State Bd. of Equalization*, 858 F.2d 1376, 1380 (9th Cir. 1988).

Under the federal question statute, a district court has "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Similarly, under the Indian tribes statute, the court has "original jurisdiction of all civil actions, brought by any Indian tribe . . . , wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." *Id.* § 1362. Thus, where a tribe is bringing suit, these provisions are duplicative— the existence of jurisdiction under both provisions depends on whether the action arises under federal law. *See id.* §§ 1331, 1362; *see also Gila River Indian Cmty. v. Henningson, Durham & Richardson*, 626 F.2d 708, 714 (9th Cir. 1980) (declining to interpret the "arises under" language in the Indian tribes provision more broadly than the corresponding language in the federal question statute).[6]

"For a case to 'arise under' federal law, a plaintiff's well-pleaded complaint must establish either (1) that federal law creates the cause of action or (2) that the plaintiff's asserted right to relief depends on the resolution of a substantial question of federal law." *K2 Am. Corp. v. Roland Oil & Gas, LLC*, 653 F.3d 1024, 1029 (9th Cir. 2011) (quoting *Peabody Coal Co. v. Navajo Nation*, 373 F.3d 945, 948 (9th Cir. 2004)). That a federally-recognized tribe is involved in the action "is not, by itself, sufficient to raise a federal question." *Peabody Coal*, 373 F.3d at 949 (citing *Gila River*, 626 F.2d at 714). Consequently, "federal courts do not have jurisdiction over run-of-the-mill contract claims brought by Indian tribes." *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1055 (9th Cir. 1997).

---

[6] Although these two statutes now "appear[] largely duplicative," when the Indian tribes provision was enacted, the federal question statute "still contained an amount in controversy requirement." 13D Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3579 Indian Tribes (3d ed. supp. 2018). "The purpose of § 1362 was to permit Indian tribes or bands of the sort described in the statute to bring a suit arising under federal law regardless of the amount in controversy." *Id.* Now that the federal question statute does not require an amount in controversy, the Indian tribes statute "is generally superfluous." *Id.*; *see also Winstead v. J.C. Penney Co.*, 933 F.2d 576, 580 (7th Cir. 1991) (Posner, J.) ("The elimination of the minimum amount in controversy from section 1331 made of the numerous special federal jurisdictional statutes that required no minimum amount in controversy . . . so many beached whales, yet no one thought to repeal those now-redundant statutes.").

Pauma's allegations seek to plead claims arising under IGRA, which the Court introduced above. IGRA explicitly confers federal question jurisdiction for several causes of action specified in the statute. *See* 25 U.S.C. § 2710(d)(7)(A)(i)–(iii). These are: (1) an action based on a state's failure to enter into negotiations to form a tribal-state compact or to conduct those negotiations in good faith; (2) an action to enjoin casino-like gaming conducted on Indian lands that is conducted in violation of a compact; and (3) an action by the Secretary of the Interior to enforce mediation procedures in the event a compact cannot be reached. *See id.*[7] The Tribe's claims do not fit into any of these categories.

In addition to these express causes of action, the Ninth Circuit has interpreted IGRA to allow a tribe to sue a state to enforce obligations in a tribal-state gaming compact. *Cabazon*, 124 F.3d at 1055–56. In *Cabazon*, four tribes entered into gaming compacts with California and "agreed to submit the question of whether the license fees collected pursuant to California Horse–Racing Law are permissible under IGRA" to the district court. *Id.* at 1053, 1062. Ultimately, the Ninth Circuit held these fees were not permissible, but once the case was remanded to the district court, the State "refused to pay the fees [back] to the [tribes], declared the Compacts invalid," and argued "the district court lacked subject matter jurisdiction to enforce the Compacts." *Id.* at 1054.

Back up on appeal, the Ninth Circuit concluded the tribes' "action seeking to enforce the Tribal-State Compacts clearly and necessarily arises under IGRA," which resulted in federal jurisdiction under 28 U.S.C. §§ 1331 and 1362. *Cabazon*, 124

---

[7] The Supreme Court held in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), that Congress lacked authority under the Indian Commerce Clause to abrogate states' sovereign immunity. Consequently, 28 U.S.C. § 2710(d)(7) does not allow a suit against a state unless the state waives its sovereign immunity. "The practical effect of this holding is to take away from tribes the ability to force states to comply with IGRA's compacting scheme." *Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256, 1261 (9th Cir. 2000). Pauma alleges the State waived its immunity in the Pauma Compact and California Government Code § 98005. (SAC ¶ 11.) Because the Court ultimately concludes it lacks jurisdiction over Pauma's claims against the State, the Court need not reach the issue of state sovereign immunity.

F.3d at 1050. The Court of Appeals reasoned that the federal interest at stake was substantial enough to confer federal question jurisdiction because "Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal–State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose." *Id.* at 1056. The Ninth Circuit also agreed with the characterization of the federal interest by the district court, which had noted:

> It would be extraordinary were [IGRA] to provide jurisdiction to entertain a suit to force the State to negotiate a compact yet provide no avenue of relief were the State to defy or repudiate that very compact. Such a gap in jurisdiction would reduce the elaborate structure of IGRA to a virtual nullity since a state could agree to anything knowing that it was free to ignore the compact once entered into. IGRA is not so vacuous.

*Id.* at 1056 (quoting the district court's order); *but see id.* at 1062–65 (Wiggins, J, dissenting on the ground that there is "no reason for the federal courts to become the arbiter of any and all disputes that may arise out of" tribal-state compacts). Thus, the Ninth Circuit rejected the State's jurisdictional argument and proceeded to address the State's sovereign immunity and the merits of the dispute. *Id.* 1056–62.

Here, Pauma brings claims against the State for declaratory relief and breach of the implied covenant of good faith and fair dealing based on the Pauma Compact. (SAC ¶¶ 280–86.) Provided that Pauma's declaratory relief claim raises a federal interest that is as substantial as the interest implicated by a breach of compact claim against the State, the Court concludes IGRA, as interpreted in *Cabazon*, provides a colorable basis for jurisdiction over these claims. They must still be justiciable, however.

## B.    Justiciable Controversy

Beyond arguing there is no jurisdictional basis for Pauma's claims, the State contends Pauma fails to allege a justiciable controversy between the Tribe and the State. (State's Mot. 5:23–7:24, 9:12–10:5.) The Court first considers Pauma's

request for declaratory relief, which was the sole claim against the State in the Tribe's initial Complaint. The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937)); *accord Am. States Ins. Co. v. Kearns*, 15 F.3d 142, 143 (9th Cir. 1994).

Accordingly, when a party pursues declaratory relief, the court must determine whether Article III's case or controversy requirement is satisfied. *See, e.g.*, *Principal Life Ins. Co. v. Robinson*, 394 F.3d 665, 669 (9th Cir. 2005); *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 893 (9th Cir. 1986). The inquiry "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *See MedImmune*, 549 U.S. at 127; *accord United States v. Braren*, 338 F.3d 971, 975 (9th Cir. 2003) (noting this standard determines the "constitutional ripeness of a declaratory judgment action"). If this standard is not met, there "is no case or controversy" because the "case is not ripe for review," and the "court lacks subject-matter jurisdiction." *Principal Life Ins. Co.*, 394 F.3d at 669 (citing *Kearns*, 15 F.3d at 143).

The facts alleged in Pauma's Second Amended Complaint do not demonstrate an actual controversy with the State. The crux of the Tribe's action is that the Union is not abiding by the Tribal Labor Ordinance's alternative dispute mechanism. (SAC ¶¶ 4–8.) The Union has instead allegedly circumvented the Ordinance by repeatedly filing unfair labor practice charges "directly with the NLRB." (*Id.* ¶¶ 4, 185, 192, 199, 206, 213, 220, 227, 234, 241, 248, 255, 263.) Accepting the Tribe's allegations

as true, it is clear that there is a dispute between the Tribe and the Union over the enforceability of the Ordinance's alternative dispute mechanism.

The same cannot be said with respect to the State. At the threshold, the State is absent from Pauma's description of the actual controversy in its pleading:

> This action presents an actual and live controversy as to whether the [Ordinance] obligates the Union to resolve any work related disputes – including unfair labor practice charges – through the binding dispute resolution process set forth within the ordinance rather than the administrative courts of the NLRB, and whether Pauma has and will continue to sustain damages as a result of the Union's refusal to abide by the terms of an agreement that it negotiated and accepted. The district court has the power to remedy this dispute in accordance with the Prayer for Relief, infra.

(SAC ¶ 13.) Further, in considering the remainder of the Tribe's pleading, Pauma does not allege facts demonstrating the State has taken an adverse position against the Tribe with respect to the Tribal Labor Ordinance. Rather, Pauma alleges that after the Tribe sent a letter to the State and met with it in the State Capitol, the State informed the Tribe that "the State did not have an official position on the matter and thus would not get involved at the time." (SAC ¶ 168; *see also id.* ¶ 269.) That is the only concrete factual allegation regarding the State's conduct prior to the filing of this action. There is no allegation that the State controls the Union or has aided the Union in filing unfair labor practice charges with the NLRB. There is similarly no allegation that the State has taken any action whatsoever against Pauma regarding the Ordinance during the Tribe's ongoing dispute with the Union.

The Court recognizes that a model of the Tribal Labor Ordinance is incorporated into Pauma's Compact with the State. Under Section 10.4 and Addendum B of the Pauma Compact, the Tribe was required to adopt the Tribal Labor Ordinance. It did. If Pauma fails to "maintain the Ordinance in effect during the term of [the] Compact," the State has the power to terminate the Compact on account of the Tribe's "material breach." But, again, there is no claim or evidence

that the State has threatened to terminate the Compact or otherwise taken an adverse action against the Tribe. The gravamen of Pauma's pleading is that the Union—not Pauma—has failed to adhere to the Ordinance.

Pauma attempts to demonstrate an actual controversy in its opposition, but the Court is unconvinced. The Tribe leans on the Supreme Court's decision in *MedImmune*, arguing that Pauma "is in the same position as the petitioner in *MedImmune*, as both are 'coerced' contracting parties who file suit to determine their rights after being faced with the pre-suit predicament of abandoning said rights or risking prosecution." (Opp'n to State's Mot. 6:11–14.) Yet, an examination of the Supreme Court's decision in *MedImmune* bolsters this Court's conclusion—not Pauma's.

In *MedImmune*, the petitioner and respondent entered into a patent license agreement. 549 U.S. at 121. The agreement provided the petitioner with the right to make and sell licensed products, so long as the company paid royalties to the respondent. *Id.* Several years later, the respondent sent the petitioner a letter expressing its belief that one of the petitioner's products was covered by a patent addressed in the license agreement. *Id.* Thus, the respondent conveyed its expectation that the petitioner would pay the respondent royalties. *Id.*

The petitioner, however, "did not think royalties were owing, believing that the [relevant] patent was invalid and unenforceable." *MedImmune*, 549 U.S. at 121–22. Nonetheless, the petitioner viewed the respondent's letter "to be a clear threat to enforce the [relevant] patent," terminate the parties' agreement, "and sue for patent infringement if petitioner did not make royalty payments as demanded." *Id.* at 122. Consequently, "[u]nwilling to risk such serious consequences, petitioner paid the demanded royalties 'under protest and with reservation of all of [its] rights.'" *Id.* (alteration in original). The company then filed a declaratory judgment action against the respondent seeking a determination that the underlying patent was invalid, unenforceable, or not infringed. *Id.* at 121–22. In light of the foregoing

circumstances, the Supreme Court held there was a justiciable controversy. *Id.* at 137.

Like the companies in *MedImmune*, the State and Pauma are parties to an agreement—the Pauma Compact. But the similarities end there. Pauma does not allege the State has taken action to enforce the Compact against the Tribe or committed conduct that the Tribe views "to be a clear threat to" do so. *See Medimmune*, 549 U.S. at 122. Pauma's theory is that *MedImmune* is analogous because the Tribe claims it risked prosecution if it did not "comply with the NLRB's procedures and orders" after the Union chose to allegedly abandon the Tribal Ordinance's dispute resolution mechanism. (Opp'n to State's Mot. 6:25–28.) "Given the contempt powers of the NLRB," Pauma contends it—like the petitioner in *Medimmune*—"had to bring suit to ameliorate a big and quickly devolving quandary created by the Union's coercive actions." (*Id.* 7:5–7.)

The Tribe's comparison does not survive scrutiny. Pauma claims it is threatened by the contempt powers of the NLRB, but Pauma is not suing the NLRB. It is suing the State of California. These arguments do not support that "there is a substantial controversy . . . of sufficient immediacy and reality" between Pauma and the State. *See MedImmune*, 549 U.S. at 127. Consequently, the Court is unpersuaded by Pauma's attempt to analogize this case to *MedImmune*'s circumstances.

The Tribe also attempts to use the State's opinion that there is no actual controversy to create one. Pauma argues the State's "impassioned defense of this suit shows" the State "is heavily invested in the outcome of this case and acting in concert with the Union." (Opp'n to State's Mot. 4:15–18.) The Court disagrees. The State has filed a motion to dismiss arguing first and foremost that there is no case or controversy between it and the Tribe. The State's belief that there is no controversy does not create one. In sum, Pauma's factual allegations fail to show a justiciable controversy to support the Tribe's declaratory relief claim against the State.

Given that there are insufficient factual allegations to demonstrate a justiciable declaratory relief claim, the Court inevitably reaches the same conclusion for Pauma's nebulous claim for breach of the implied covenant of good faith and fair dealing. In support of this claim, Pauma seeks to use a court-mandated meet-and-confer session to inject an actual controversy into this lawsuit. As mentioned, Pauma alleges that after it filed its initial Complaint, the parties participated in a meet-and-confer session required by this Court's Standing Order for Civil Cases to discuss an anticipated motion to dismiss by the State. (SAC ¶¶ 170–73.) There, "counsel for the State questioned the Court's jurisdiction" and "explained its perception that Pauma's suit was really one against the Union, which meant the State should not be a party to the suit especially since Pauma had not alleged a breach of compact claim against the State." (*Id.* ¶ 171.) Pauma's counsel then "agreed to dismiss the State [] from the suit if [it] stipulated to be bound by the order issued by the Court on the declaratory relief claim," but the State declined "to enter into such an agreement." (*Id.*)

Pauma uses this meet-and-confer meeting in its Second Amended Complaint to try to stitch together a justiciable controversy by adding a claim for breach of the implied covenant of good faith and fair dealing in the Pauma Compact. (SAC ¶¶ 280–86.) Pauma claims the State's (i) lack of an official position on the Tribe's dispute with the Union, (ii) unwillingness to voluntarily participate in this lawsuit, and (iii) decision to decline Pauma's dismissal offer demonstrates the State has breached Pauma's "reasonable expectations" under the Pauma Compact. (*Id.* ¶ 284.) Pauma also claims the State has failed "to take reasonable efforts to ensure that its privy in interest the Union would comply with the [Tribal Labor Ordinance], even if that simply meant directing it to first file any such unfair labor practice claims through the procedure in the [Tribal Labor Ordinance] while the declaratory relief claim in this matter was being adjudicated." (*Id.* ¶ 285.) Yet, again, there is no

allegation that the State has aided the Union or that the State has the power to "direct[]" the Union to do anything. This effort to use a court-mandated meet-and-confer session to transmute an inchoate declaratory relief claim into a justiciable breach of contract claim is not convincing.

Regardless of the legal theory employed, when the Court examines the factual allegations in Pauma's pleading regarding Pauma and the State, the Court does not discern an actual case or controversy between these parties. Pauma has the burden of demonstrating subject matter jurisdiction, which includes a justiciable controversy, but it does not meet this burden. Consequently, the Court **GRANTS** the State's motion to dismiss Pauma's action against it for lack of subject matter jurisdiction.

## II.     Union's Motion to Dismiss

Having dismissed Pauma's claims against the State for lack of jurisdiction, the Court considers whether it has jurisdiction over Pauma's remaining claims against the Union. Aside from seeking comparable declaratory relief, Pauma is suing the Union for breach of the Tribal Labor Ordinance, with the Tribe characterizing its claims as being for breach of the Pauma Compact. (SAC ¶¶ 195–279.) In its own motion to dismiss, the Union argues that there is no independent basis to exercise jurisdiction over Pauma's claims against the Union. (Union's Mot. 6:14–9:5.) Relatedly, the Union argues that if the Court dismisses the Tribe's claims against the State for lack of jurisdiction, there is no basis to invoke supplemental jurisdiction over the Tribe's remaining claims. (*Id.* 12:3–11.)

The Court agrees that there is no independent basis for jurisdiction over Pauma's claims against the Union. In making this determination, the Court recognizes the potential obstacles to Pauma bringing "breach of compact" claims against the Union. For example, the Union is not a signatory to the Pauma Compact or the agreement's Addendum B that attaches the Tribal Labor Ordinance to be adopted by Pauma. (Pauma Compact, ECF No. 33-1 at Ex. 1-41, 49.) In the same

vein, the Union is not identified as a party to the Pauma Compact. (*Id.* at 1-1 (providing "[t]his Tribal-State Gaming Compact is entered into on a government-to-government basis by and between [Pauma] and the [State] pursuant to [] [IGRA]").) In addition, Pauma does not allege it negotiated the Pauma Compact or the content of the Tribal Labor Ordinance with the Union—the Tribe alleges it executed the Compact "through a simple exchange of letters with the Office of the Governor." (*See* SAC ¶¶ 114–15.) Finally, the plain language of the Pauma Compact requires the Tribe to adopt and maintain the Tribal Labor Ordinance as tribal law to address "organizational and representational rights of Class III gaming Employees." (Pauma Compact § 10.7, Add. B.) This compact requirement plainly places an enforceable obligation on Pauma, not the State—or any other party. (*See id.*) *Cf. Unite Here Int'l Union v. Pala Band of Mission Indians*, 583 F. Supp. 2d 1190, 1198 (S.D. Cal. 2008) (Whelan, J.) (finding the Tribal Labor Relations Ordinance is "incorporated by reference" into the 1999 Compact "only in the most technical sense").

Those potential obstacles aside, in assessing jurisdiction, the Court will adopt as true Pauma's allegation that the Union "accepted" the Tribal Labor Ordinance. (SAC ¶ 13.) The Court will also assume, for the sake of argument, that because the Union accepted the benefits of an ordinance enacted by Pauma as tribal law, and because a copy of the tribal ordinance is incorporated into the Pauma Compact as part of Pauma's agreement with the State, that means the Tribe can sue the Union for "breach of compact." (*See* Pauma Compact § 10.7, Add. B.)

Having adopted Pauma's framing of the compact and the tribal ordinance, the Court repeats that as a starting point it does "not have jurisdiction over run-of-the-mill contract claims brought by Indian tribes." *See Cabazon*, 124 F.3d at 1055. In its opposition to the Union's motion, the Tribe argues that its claims do not fall under this category because they are instead analogous to the four tribes' breach of compact claims against California in *Cabazon*. *Id.* at 1050. As summarized above, in *Cabazon*, the Ninth Circuit concluded the tribes' action against the state for breach

of their tribal-state compacts presented a substantial enough federal interest to be "arising under" IGRA. *See id.* at 1055–56 (citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 814 n.12 (1986)). The Tribe argues that the "similarities between *Cabazon* and the instant matter could not be any more apparent." (Opp'n to Union's Mot. 12:4–6.) The "only wrinkle between the present case and *Cabazon*," in Pauma's view, is the addition of the Union "in the compact dispute." (*Id.* 14:12–13.)

This distinction is more than a wrinkle. Again, the default rule is that a federal court does not have jurisdiction over a tribe's general contract claims. *Cabazon*, 124 F.3d at 1055. In deviating from that rule in *Cabazon*, the Ninth Circuit reasoned there is an important federal interest in enforcing "Tribal-State compacts in the federal courts" because "Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal–State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose." *Id.* at 1056. As the district court had also recognized: "It would be extraordinary were [IGRA] to provide jurisdiction to entertain a suit to force the State to negotiate a compact yet provide no avenue of relief were the State to defy or repudiate that very compact." *Id.*

The same concerns do not arise here for Pauma's claims against the Union. The Union, as a private party, cannot evade its alleged contractual promises with assertions of state sovereign immunity. *See Cabazon*, 124 F.3d at 1056; *cf. Unite Here*, 583 F. Supp. 2d at 1198 (noting in the context of an action between the Union and a different tribe, the necessity to provide a federal forum in *Cabazon* was missing because "neither litigant is significantly disadvantaged by proceeding in a state or tribal forum"). And there is no comparable danger that a federal court's failure to entertain the Tribe's breach of compact claims against the Union "would reduce the elaborate structure of IGRA to a virtual nullity." *See Cabazon*, 124 F.3d at 1056.

Consequently, at a minimum, the importance of any federal interest raised by Pauma's alleged breach of compact claims against the Union is diminished in these circumstances.  *See Cabazon*, 124 F.3d at 1055–56.  Given the foregoing, this Court is wary of "[becoming] the arbiter of any and all disputes that may arise out of [gaming compacts]."  *See Unite Here*, 583 F. Supp. 2d at 1197 (alterations in original) (quoting *Cabazon*, 124 F.3d at 1064 (Wiggins, J., dissenting), and expressing this caution where "neither [] IGRA nor *Cabazon* expressly confer federal jurisdiction for this type of action").  Indeed, Pauma does not identify any decisions in this circuit that have extended *Cabazon*'s reasoning to a situation involving a party that is neither the "state" nor the "tribe" in a tribal-state gaming compact under IGRA.  (*See* Opp'n to Union's Mot. 10:6–16:12; *see also* Union's Reply 4:16–17 (arguing that "[n]o court has adopted Pauma's expansive theory of *Cabazon* jurisdiction").)  Ultimately, none of the Tribe's arguments convince this Court that Pauma's claims against the Union present a substantial enough federal interest to allow these claims to arise under IGRA.  *See* 28 U.S.C. § 1331, 1362.

In sum, this is a Court "of limited jurisdiction," and "[i]t is to be presumed that" Pauma's claims against the Union "lie[] outside this limited jurisdiction."  *See Kokkonen*, 511 U.S. at 377.  Pauma does not meets its "burden of establishing the contrary."  *See id.*  The Court consequently **GRANTS** the Union's motion to dismiss for lack of jurisdiction.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** the State's motion to dismiss for lack of subject matter jurisdiction and **TERMINATES AS MOOT** the State's accompanying motion to strike allegations in Pauma's pleading (ECF No. 36).  The Court similarly **GRANTS** the Union's motion to dismiss for lack of subject matter jurisdiction and **TERMINATES AS MOOT** the Union's accompanying motion to strike (ECF No. 34).

16cv2660

In opposing the motions to dismiss, Pauma requests leave to file a Third Amended Complaint in the event that this Court grants the State's and Union's motions. (Opp'n to Union's Mot. 15:19–16:12; Opp'n to State's Mot. 26:3.) In light of concerns over jurisdiction and the futility of a proposed amendment, the Court defers determining whether granting leave is appropriate until the Court may review a proposed amended pleading. If Pauma seeks to file a Third Amended Complaint, it must first file a noticed motion for leave to amend with the proposed pleading attached and in compliance with Civil Local Rule 15.1. Any such motion must be filed no later than **October 19, 2018**. Accordingly, the Court **DISMISSES WITHOUT PREJUDICE** Pauma's Second Amended Complaint (ECF No 33).

**IT IS SO ORDERED.**

**DATED: September 28, 2018**

**Hon. Cynthia Bashant**
**United States District Judge**