# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUMA BAND OF LUISENO MISSION INDIANS OF THE PAUMA AND YUIMA RESERVATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITE HERE INTERNATIONAL UNION; STATE OF CALIFORNIA; GAVIN NEWSOM, as Governor of the State of California,<br><br>Defendants. | Case No. 16-cv-2660-BAS-AGS<br><br>**ORDER DENYING MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**<br><br>**[ECF No. 44]** |

# OVERVIEW[1]

This action is an offshoot from a bitter labor dispute between a union and a casino operator. Plaintiff Pauma Band of Luiseno Mission Indians of the Pauma & Yuima Reservation ("Pauma" or "Tribe") is a federally-recognized tribe that operates Casino Pauma on its reservation in Northern San Diego County. "About 2,900 customers visit Casino Pauma each day," and the Casino "employs 462 employees." *Casino Pauma v. N.L.R.B.*, 888 F.3d 1066, 1070 (9th Cir. 2018).

---

[1] The Court set forth an overview and background for this action in its order dismissing the Second Amended Complaint. (*See* Order Granting Defs.' Mots. to Dismiss ("MTD Order") 1:20–11:7, ECF No. 43.) Except for changes to reflect the Court's prior ruling and Pauma's proposed amended pleading, the Court restates these sections.

In 2013, Defendant UNITE HERE International Union ("Union"), which represents service and manufacturing employees, began an organizing drive at Casino Pauma. The Tribe claims this organizing effort involved a series of "antics," including the Union inviting *The San Diego Union Tribune* to a "staged rally." (Proposed Third Am. Compl. ("TAC") ¶¶ 151–54, ECF No. 44-2.) There, the Tribe highlights that a casino employee allegedly spoke "exclusively through a translator" and "explained that she was 'a cook in the casino's pizza restaurant' who had a '$16 hourly salary,' but nevertheless struggled to pay '$260 a month for health insurance for her family' of undisclosed size." (*Id.* ¶ 154.)

As another tactic, Pauma alleges the Union "went berserk," filing a flurry of unfair labor practice charges against Casino Pauma with the National Labor Relations Board ("NLRB"). (TAC ¶ 5.) Pauma claims that "the one thing that all of these charges have in common is that they seek to turn Casino Pauma into a soapbox for the Union, whereby sympathetic employees can communicate the Union's message *directly to customers* in any 'guest area' of the gaming facility or associated property—whether that is within a shuttle bus, across a restaurant table, inside a family changing room, or underneath a bathroom stall." (*Id.*)

Ultimately, however, the Union's charges led to the General Counsel of the NLRB filing several administrative complaints against Casino Pauma for unfair labor practices. *Casino Pauma v. N.L.R.B.*, 888 F.3d at 1071. The General Counsel's allegations included that Casino Pauma had "interfere[ed] with the distribution of union literature by employees near the public entrance to [the] casino," "threaten[ed] employees with discipline for distributing union literature at that location," and "interrogat[ed] an employee about her union activity." *Id.* at 1071 n.1. After a three-day trial, an administrative law judge determined "Casino Pauma violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, in most of the ways the General Counsel alleged," and the NLRB affirmed. *Id.* at 1071; *see also Casino Pauma (Casino Pauma II)*, 363 N.L.R.B. No. 60 (Dec. 3, 2015).

The Tribe and the Union continued their dispute in the Court of Appeals. The NLRB filed a petition for enforcement of its order against Casino Pauma in the Ninth Circuit, the Tribe filed a separate petition for review, and the Union intervened in opposition to Pauma. *See Casino Pauma v. N.L.R.B.*, 888 F.3d at 1072. The Ninth Circuit rejected the Tribe's challenges and granted the NLRB's petition for enforcement. *Id.* at 1085. In doing so, the Ninth Circuit upheld the NLRB's "determination that tribe-owned casinos can be NLRA-covered employers," and the court concluded "the NLRA governs the relationship between Casino Pauma and its employees." *See id.* at 1079.

In the offshoot before this Court, Pauma alleges that by filing the series of unfair labor practice charges directly with the NLRB, the Union has skirted a binding dispute resolution process. (TAC ¶¶ 5, 150–64.) This dispute resolution process is found in a tribal labor ordinance that the State required Pauma to enact to engage in casino-style gaming. (*Id.* ¶ 2 & n.1.) The Tribe requests that this Court rein in the Union by forcing "arbitration of any open unfair labor practice claims" and ordering the Union to pay Pauma "the costs involved in litigating" the labor charges filed with the NLRB. (*Id.* Prayer ¶¶ 2–4.) The Union, on the other hand, has argued this ancillary labor dispute is an "improper collateral attack on NLRB proceedings," an effort "to circumvent Ninth Circuit review" of the NLRB's order discussed above, and the product of "procedural gamesmanship." (ECF No. 34-1.)

The Tribe and the Union's dispute has spilled over into this Court because the Tribe is also suing two other defendants—the State of California and Governor Gavin Newsom[2] (collectively, "State"). Pauma tries to pull the State into the fray by alleging the State has failed to take "reasonable efforts to ensure" the Union would comply with the dispute resolution process, including by failing to "direct[] [the

---

[2] The Court substitutes California Governor Gavin Newsom in place of the former official, Edmund G. Brown, Jr. *See* Fed. R. Civ. P. 25(d)(1).

Union] to first file any such unfair labor practice claims through" that process, as opposed to proceeding directly before the NLRB. (TAC ¶ 285.)

Previously, the State moved to dismiss this action for lack of subject matter jurisdiction, arguing Pauma failed to demonstrate a justiciable controversy between these two parties. (ECF No. 36.) The Union similarly moved to dismiss for lack of jurisdiction. (ECF No. 34.) The Court granted the motions. (MTD Order 24:21–27.) The Court concluded Pauma's pleading failed to demonstrate a justiciable controversy against the State, and the Court discerned no independent basis to exercise jurisdiction over the Tribe's remaining declaratory relief and breach of contract claims against the Union. (*Id.* 15:25–24:20.) Consequently, the Court dismissed Pauma's Second Amended Complaint. (*Id.* 25:9–10.)

Pauma now moves for leave to file a Third Amended Complaint. (ECF No. 44.) The State and the Union oppose.[3] (ECF Nos. 45, 46.) Upon review, Pauma's proposed amended pleading does not add any new factual allegations to remedy the defects identified in the Court's prior order. And the Tribe's renewed legal arguments remain unpersuasive. Consequently, the Court **DENIES** Pauma's motion.

## BACKGROUND

Pauma claims this case turns on a model tribal ordinance that is an addendum to a tribal-state gaming compact. Pauma and the State of California entered into this gaming compact under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701–21. Hence, the Court first provides a brief overview of IGRA before expanding upon the Tribe's allegations.

**I.    Indian Gaming Regulatory Act**

"In 1988, Congress attempted to strike a delicate balance between the sovereignty of states and federally recognized Native American tribes by passing IGRA." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Reservation v.*

---

[3] The Court finds Pauma's motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1).

*California*, 813 F.3d 1155, 1160 (9th Cir. 2015). IGRA's general purpose is "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1).

To accomplish this purpose, IGRA "creates a framework for regulating gaming activity on Indian lands." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 785 (2014) (citing 25 U.S.C. § 2702(3)). "The Act divides gaming on Indian lands into three classes—I, II, and III." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996). IGRA then "assigns authority to regulate gaming to tribal and state governments depending on the class of gaming involved." *Big Lagoon Rancheria v. California*, 789 F.3d 947, 949 (9th Cir. 2015) (en banc).

The final category—Class III gaming—"includes the types of high-stakes games usually associated with Nevada-style gambling." *In re Indian Gaming Related Cases*, 331 F.3d 1094, 1097 (9th Cir. 2003) ("*Coyote Valley*"). "As a result, Class III gaming is subjected to the greatest degree of control under IGRA's regulations." *Pauma v. California*, 813 F.3d at 1060. A tribe may conduct Class III gaming "only if such activities are conducted pursuant to a Tribal-State Compact entered into by the tribe and a state that permits such gaming, and the Compact is approved by the Secretary of the Interior." *Id.* (citing *Coyote Valley*, 331 F.3d at 1097); *see also* 25 U.S.C. § 2710(d)(1), (3)(B). Thus, IGRA contemplates that a tribe and the relevant state shall negotiate to enter into a compact that (i) permits Class III gaming and (ii) may address various regulatory issues related to this type of gaming. *See* 25 U.S.C. § 2710(d)(3)(A), (C) (identifying the permissible gaming compact topics to include standards for "maintenance of the gaming facility" and "licensing").

## II. Pauma's Compact with the State

Historically, Pauma's members "relied upon subsistence farming and federal funding to stave off destitution." (TAC ¶ 111.) In 2000, Pauma sought to improve its members' circumstances by opening a tribal gaming facility. (*See id.* ¶¶ 111–16.)

To do so, the Tribe entered into a tribal-state gaming compact with the State of California under IGRA. (Tribal-State Compact Between the State of California and the Pauma Band of Mission Indians ("Pauma Compact"), Second Amended Complaint ("SAC") Ex. 1, ECF No. 33-1.[4])

The terms of the Pauma Compact are not unique. In 1999, the State of California and numerous tribes negotiated a form compact—the "1999 Compact." *See Coyote Valley*, 331 F.3d at 1101–07 (detailing the course of negotiations). Pauma's agreement is an executed version of the 1999 Compact. (*See* TAC ¶¶ 68–85, 114.) When the State and various tribes were negotiating the 1999 Compact, a point of contention was the collective bargaining rights of employees at tribal gaming facilities. (*Id.* ¶¶ 69–76.) The Union opposed the approval of any gaming compacts that did not include desired protections for workers. (*Id.* ¶ 69.) The State's negotiator believed the issue of collective bargaining rights could be "work[ed] out directly with the Union." (*Id.* ¶ 72.) However, the initial discussions between the negotiating tribes and the Union "were unfruitful" because of the Union's efforts to invalidate a voter initiative concerning tribal gaming. (*Id.*)

As the negotiation deadline for the 1999 Compact neared, the State presented the tribes with its "final compact offer." (TAC ¶ 74.) "Since the tribes had been unable to agree upon labor relations provisions with the Union," the State's offer included a provision requiring the tribes to provide an "agreement or other procedure acceptable to the State for addressing organizational and representational rights of Class III Gaming Employees and other employees associated with the Tribe's Class III gaming enterprise." (*Id.* ¶ 75; *see also* Pauma Compact § 10.4.) If the tribes failed to do so by a set deadline, the 1999 Compact provided the agreement would be rendered null and void. (*See* Pauma Compact § 10.4.)

---

[4] Pauma's Proposed Third Amended Complaint relies upon the same thirty-two exhibits that are appended to the Second Amended Complaint. (*See* Mot. n.2; *see also* ECF Nos. 33, 44.)

"Fifty-seven tribes participating in the negotiations signed letters of intent to execute the compacts . . . in accordance with the State's request." (TAC ¶ 76.) "With that, the signatory tribes continued to negotiate collective bargaining rights for casino employees with the Union," with the aim of reaching an agreement by the 1999 Compact's deadline. (*Id.*)

### III. Model Tribal Labor Relations Ordinance

The result of the tribes and union representatives' efforts is the Model Tribal Labor Relations Ordinance dated September 14, 1999 ("Tribal Labor Ordinance" or "Ordinance"). (TAC ¶ 78; *see also* Tribal Labor Ordinance, Attachment to Pauma Compact Add. B, SAC Ex. 1 at 1-50.) The Tribal Labor Ordinance provides that:

> Eligible Employees shall have the right to self-organization, to form, to join, or assist employee organizations, to bargain collectively through representatives of their own choosing, to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all such activities.

(Tribal Labor Ordinance § 4.) Further, the Ordinance defines unfair labor practices for the tribe and labor organizations. (*Id.* §§ 5–6.) It also provides for alternative dispute resolution. (*Id.* § 13.) Specifically, the Ordinance states:

> All issues shall be resolved exclusively through the binding dispute resolution mechanisms herein, with the exception of a collective bargaining negotiation impasse, which shall only go through the first level of binding dispute resolution.

(*Id.* § 13(a).) If the informal portion of the dispute resolution process is unsuccessful, the tribe and the labor organization are to submit their dispute to arbitration before a mutually agreed upon arbitrator or several arbitrators from a ten-member "Tribal Labor Panel" created under the Tribal Labor Ordinance. (*Id.* § 13(c)(1).) Other topics addressed by the Ordinance include procedures for union elections, access to eligible employees, and decertification of certified unions. (*Id.* §§ 8, 10, 12.)

## IV. Pauma's Adoption of the Tribal Labor Ordinance

Pauma was not one of the tribes that participated in the negotiation of the 1999 Compact and the Tribal Labor Ordinance. (TAC ¶ 115.) Consequently, when Pauma entered into the Pauma Compact in 2000, the Tribe did so by executing a form version of the 1999 Compact "through a simple exchange of letters with the Office of the Governor." (*Id.* ¶ 114.) Addendum B to the Pauma Compact states:

> In compliance with Section 10.7 of the Compact, the Tribe agrees to adopt an ordinance identical to the Model Tribal Labor Relations Ordinance attached hereto, and to notify the State of that adoption no later than May 5, 2000. If such notice has not been received by the State by May 5, 2000, this Compact shall be null and void. Failure of the Tribe to maintain the Ordinance in effect during the term of this Compact shall constitute a material breach entitling the State to terminate this Compact. No amendment of the Ordinance shall be effective unless approved by the State.

(SAC Ex. 1 at 1-49.) Both the State and Pauma executed Addendum B to the Pauma Compact. (*Id.*) Further, Pauma provided notice to the State that on April 27, 2000, the Tribe "adopted the Tribal Labor Relations Ordinance pursuant to Section 10.7 of the" Pauma Compact—satisfying the condition mentioned in Addendum B above. (*Id.* at 1-51.) Although the Union allegedly negotiated the content of the Tribal Labor Ordinance with other tribes, the Union is not a signatory to the Pauma Compact or its Addendum B containing the Model Tribal Labor Relations Ordinance to be enacted as tribal law. (*Id.* at 1-41, 1-49.) Rather, the tribal-state gaming compact was "entered into on a government-to-government basis by and between" Pauma and the State. (*Id.* at 1-5.)

Accordingly, having entered into the Pauma Compact to satisfy IGRA's requirements to conduct Class III gaming activities, Pauma opened a gaming facility on its reservation in Pauma Valley the following year. (TAC ¶¶ 14, 116.)

## V. Labor Dispute at Casino Pauma

Over a decade later, the Union engaged in the aforementioned effort to unionize workers at Casino Pauma. (*See* TAC ¶¶ 144–56.) As part of its efforts, the Union allegedly sought to allow Casino Pauma workers to use "card check election procedures" to decide whether to make the Union their representative. (*See id.* ¶¶ 5, 134, 145, 150–51.) Pauma, however, informed the Union "that any representational effort would have to take place" according to "secret ballot election" procedures contained in the Tribal Labor Ordinance. (*Id.* ¶ 5.) Then, on May 25, 2012, a Union director invoked the dispute resolution process under the Tribal Labor Ordinance, and the Union later proceeded to seek appointment of an arbitrator, but the Union subsequently withdrew its request for arbitration under Pauma's Ordinance. (*Id.* ¶¶ 145–48.)

The Tribe claims the Union then "went berserk, filing *nine* unfair labor practice charges against Pauma directly with the NLRB." (TAC ¶ 5.) In doing so, Pauma alleges the Union "abandoned the 'binding dispute resolution mechanism'" contained in the Tribal Labor Ordinance. (*Id.* ¶ 156.) And, because the Union has opted to pursue its unfair labor charges against Pauma with the NLRB instead of the dispute resolution process, Pauma claims it has incurred "at least $400,000" in legal fees and expenses." (*Id.* ¶ 162.)

## VI. Pauma's Attempt to Involve the State

In September 2016, Pauma's counsel sent a letter to the State of California regarding "the Union's non-compliance with" the Tribal Labor Ordinance. (TAC ¶ 167.) In a subsequent meeting at the State Capitol, Pauma's counsel "requested the State's assistance in holding the Union to the terms of the [Tribal Labor Ordinance] or otherwise devising a fix for the solution." (*Id.* ¶ 168.) "In response, the Office of the Governor's Senior Advisor for Tribal Negotiations Joginder Dhillon explained that the State did not have an official position on the matter and thus would not get

involved at the time, though he would communicate possible solutions should he think of any." (*Id.*)

## VII. Pauma's Lawsuit and Prior Pleadings

Pauma filed this action on October 27, 2016, against the State and the Union. In its initial Complaint, the only claim Pauma pled against the State was for declaratory relief. (Compl. ¶¶ 148–54, ECF No. 1.) The Tribe alleged an actual controversy exists regarding the Tribal Labor Ordinance because Pauma is "arguing for the dispute resolution procedure in the" Ordinance, the Union is arguing for "the NLRA," and the State is purportedly "feigning indifference despite demanding that the signatory tribes agree to the [Tribal Labor Ordinance] in the first place." (*Id.* ¶ 154.)

In Pauma's Second Amended Complaint,[5] Pauma supplemented its pleading with allegations arising from a meet-and-confer meeting required by this Court's Standing Order for Civil Cases. (SAC ¶¶ 170–73.) Under this Court's Standing Order, "[a]ny party contemplating the filing of any noticed motion before this Court must first contact opposing counsel to discuss thoroughly—preferably in person—the substance of the contemplated motion and any potential resolution." During such a conference, Pauma alleged "counsel for the State questioned the Court's jurisdiction." (*Id.* ¶ 171.) Counsel for the State opined "that Pauma's suit was really one against the Union, which meant that the State should not be a party to the suit especially since Pauma had not alleged a breach of compact claim against the State." (*Id.*) "Nevertheless, in an attempt to eliminate the need for the State's motion to dismiss, counsel for Pauma agreed to dismiss the State [] from the suit if [it] stipulated to be bound by the order issued by the Court on the declaratory relief claim." (*Id.*) The State declined to "enter into such an agreement in order to secure [its] dismissal

---

[5] Pauma previously filed a First Amended Complaint, which the State and the Union moved to dismiss while Pauma moved for leave to amend to file a Second Amended Complaint. (ECF Nos. 13–15.) "In light of the liberal policy favoring amendment," the Court granted Pauma's request to amend and deferred consideration of Defendants' challenges to Pauma's action. (ECF No. 32.)

from the case." (*Id.*) Based on this conduct, Pauma alleged the State breached the implied covenant of good faith and fair dealing in the Pauma Compact. (*Id.* ¶¶ 280–86.)

In addition, Pauma's Second Amended Complaint joined the Union in its declaratory relief claim. (SAC ¶¶ 187–94.) Pauma also pled a series of claims alleging the Union has purportedly breached the Pauma Compact by not adhering to the dispute resolution process in the Tribal Labor Ordinance that was enacted by Pauma and appended to the Pauma Compact. (*Id.* ¶¶ 195–279.)

## VIII. Order Dismissing the Second Amended Complaint

Previously, the State and the Union moved to dismiss Pauma's Second Amended Complaint. (ECF Nos. 34, 36.) The State argued Pauma's pleading did not identify a suitable basis for jurisdiction and failed to plead a live, justiciable controversy between the Tribe and the State. (ECF No. 34 at 1:2–25, 5:21–11:6.)

To resolve the State's first argument, the Court examined the various grounds for jurisdiction alleged in Pauma's pleading. (MTD Order 12:1–15:24.) The Court determined several of these items, including the Federal Arbitration Act ("FAA") and the Declaratory Judgment Act, do not provide an independent basis for federal jurisdiction. (*Id.* 12 n.5.) The Court also examined *Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050 (9th Cir. 1997), in assessing the potential for jurisdiction under the federal question and Indian tribes statutes. (*Id.* 12:14–15:23.) In that case, the State of California attempted to repudiate a tribal-state gaming compact after an unfavorable appellate decision and argued there was no federal question jurisdiction to consider breach of compact claims. *See Cabazon*, 124 F.3d at 1054–55. The Ninth Circuit was unconvinced; it reasoned there is a federal interest that is substantial enough to warrant federal jurisdiction over breach of gaming compact claims because "[i]t would be extraordinary were [IGRA] to provide jurisdiction to entertain a suit to force the State to negotiate a compact yet provide no avenue of relief were the State to defy or repudiate that very compact." *See id.* at 1056 (quoting

the district court below).  This Court thus reasoned that IGRA, as interpreted in *Cabazon*, provides a colorable basis for jurisdiction over Pauma's claims against the State for declaratory relief and breach of a tribal-state gaming compact.  (MTD Order 12:14–15:23.)

That said, the Court concluded Pauma failed to plead an actual controversy between the Tribe and the State.  (MTD Order 15:25–21:11.)  The Court noted that Pauma did not "allege facts demonstrating the State has taken an adverse position against the Tribe with respect to the Tribal Labor Ordinance." (*Id.* 17:12–13.)  There was no claim or evidence that the State had "threatened to terminate the Compact" or any facts demonstrating that the State somehow "controls the Union or has aided the Union in filing unfair labor practice charges with the NLRB." (*Id.* 17:19–18:20.)  Further, the Court rejected Pauma's attempts to generate an actual case or controversy by relying upon the State's (i) opinion that there is no actual controversy and (ii) conduct at a meet-and-confer session concerning this litigation.  (*Id.* 19:20–21:7.)  Accordingly, Pauma did not meet its burden of demonstrating subject matter jurisdiction, and the Court granted the State's motion to dismiss.  (*Id.* 21:10–11.)

Turning to the Union's motion, the Court analyzed whether it had subject matter jurisdiction over the Tribe's claims against the Union.  (MTD Order 21:12–24:20.)  Given that the Court dismissed the Tribe's claims against the State, the Court discerned no independent basis for jurisdiction over Pauma's remaining claims.  (*Id.* 21:23–24.)  The Court reasoned that "it does 'not have jurisdiction over run-of-the-mill contract claims brought by Indian tribes.'" (*Id.* 22:23–24 (quoting *Cabazon*, 124 F.3d at 1055).)  And although the Ninth Circuit interpreted IGRA to provide jurisdiction for a tribe's claims against the State of California in *Cabazon*, the Court reasoned this case is distinguishable from *Cabazon*.  (*Id.* 23:8–24:15.)  In particular, the Court noted that the "Union, as a private party, cannot evade its alleged contractual promises [in state or tribal court] with assertions of state sovereign immunity." (*See id.* 23:19–25.)  Therefore, "there is no comparable danger that a

federal court's failure to entertain the Tribe's breach of compact claims against the Union 'would reduce the elaborate structure of IGRA to a virtual nullity.'" (*Id.* 23:25–27 (quoting *Cabazon*, 124 F.3d at 1056).) Simply put, even though Pauma's claims against the Union are purportedly based on an addendum to the Pauma Compact, the Court believed there is not a substantial enough federal interest under IGRA to confer subject matter jurisdiction where a tribe is seeking to enforce a tribal-state compact against a private party. (*See id.*)

The Court also highlighted that Pauma did "not identify any decisions in this circuit that have extended *Cabazon*'s reasoning to a situation involving a party that is neither the 'state' nor the 'tribe' in a tribal-state gaming compact under IGRA." (MTD Order 24:8–12.) Accordingly, the Court concluded Pauma did not meet its burden of establishing the Court's jurisdiction over the Tribe's claims against the Union, and the Court therefore granted the Union's motion to dismiss. (*Id.* 24:16–20.)

Finally, the Court considered Pauma's request for leave to file a Third Amended Complaint. (MTD Order 25:1–3.) Because the Court harbored concerns "over jurisdiction and the futility of a proposed amendment," the Court deferred determining whether granting leave to amend is appropriate until the Court could review a proposed amended pleading. (*Id.* 25:3–6.) The Court thus directed Pauma to file a noticed motion for leave to file an amended pleading. (*Id.* 25:6–9.) The Court then dismissed without prejudice Pauma's Second Amended Complaint. (*Id.* 25:9–10.)

### IX. Proposed Third Amended Complaint

Pauma now moves for leave to file its Proposed Third Amended Complaint. (Mot., ECF No. 44.) The Tribe proposes minimal changes to its pleading. (*See* Redlined TAC, Mot. Ex. B., ECF No. 44-3.) First, Pauma seeks to identify additional legal authority for its position that this Court has jurisdiction over this suit. (*Id.* ¶ 10.) Second, the Tribe retitles most of its claims against the Union as claims for not

only breach of the Pauma Compact, but also for "[v]iolation of IGRA." (*See id.* 54:21–24, 56:21–23, 58:15–17, 60:9–11, 62:2–4, 63:24–26, 65:18–20, 67:12–14, 69:9–11, 71:3–5, 72:25–27.) Finally, Pauma makes a few minor changes to its prayer for relief. (*See id.* 79:24–80:5.)

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 15(a), a plaintiff may amend its complaint once as a matter of course within specified time limits. Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." *Id.* 15(a)(2).

Nevertheless, the court has discretion "to deny leave to amend due to 'undue delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , [or] futility of amendment.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1045 (9th Cir. 2015) (alteration in original) (quoting *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892 (9th Cir. 2010)). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). A proposed amendment is futile if it leaves the court without subject matter jurisdiction. *E.g.*, *Wright v. Incline Vill. Gen. Imp. Dist.*, 597 F. Supp. 2d 1191, 1211 (D. Nev. 2009); *Paramount Pictures Corp. v. Replay TV*, 298 F. Supp. 2d 921, 927 (C.D. Cal. 2004).

**ANALYSIS**

Pauma argues granting leave to amend is appropriate because the Third Amended Complaint demonstrates this Court has subject matter jurisdiction over the Tribe's claims against the State and the Union. (Mot. 1:12–5:12.) Defendants counter that the motion should be denied because the proposed pleading does not cure the deficiencies identified in the Court's order dismissing the Second Amended

Complaint. (Union's Opp'n 1:3–17, ECF No. 45, State's Opp'n 3:3–5:5, ECF No. 46.)

Initially, the Court underscores that Pauma's Third Amended Complaint does not add any new factual allegations. (*See* Redlined TAC ¶¶ 1–286.) Hence, Pauma still does not allege facts demonstrating the State has taken an adverse position against the Tribe with respect to the Tribal Labor Ordinance, threatened to terminate the Pauma Compact, or engaged in other conduct that demonstrates an actual controversy with the State. (*See* MTD Order 16:23–19:28.) Because Pauma does not include any new factual allegations in its Third Amended Complaint, the Court confirms its prior conclusion that the Court lacks subject matter jurisdiction over this dispute. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (providing that the Court resolves "a facial attack" under Rule 12(b)(1) by accepting as true the plaintiff's allegations and determining whether they "are sufficient as a legal matter to invoke the court's jurisdiction").

Pauma's attendant legal arguments also remain unconvincing. The Tribe renews and expands upon several jurisdictional arguments that were raised in its prior pleading and its unsuccessful oppositions to Defendants' motions to dismiss. (*See* TAC ¶ 10; *see also* SAC ¶ 10; ECF Nos. 37, 38.) The Court will briefly address each item.

First, Pauma argues federal jurisdiction exists because signatories can enforce tribal-state gaming compacts. (Mot. 12:1–3:9.) The Court agrees that Pauma can potentially sue the State for declaratory relief and purported violations of the Pauma Compact. (*See* MTD Order 15:15:20–23 (reasoning "IGRA, as interpreted in *Cabazon*, provides a colorable basis for jurisdiction over these claims").) Pauma's argument does not address, however, the Court's conclusion that Pauma fails to allege facts demonstrating an actual dispute between Pauma and the State concerning the Tribal Labor Ordinance. (*See* MTD Order 16:23–19:28.) And the Court remains unpersuaded that federal jurisdiction exists under IGRA to entertain claims for

purported breach of compact against the Union—a party that is neither a state nor a tribe under IGRA. As the Court noted in its prior order, the Ninth Circuit reasoned in *Cabazon* that federal jurisdiction is appropriate for breach of compact claims against a state because "Congress, in passing IGRA, did not create a mechanism whereby states can make empty promises to Indian tribes during good-faith negotiations of Tribal–State compacts, knowing that they may repudiate them with immunity whenever it serves their purpose." 124 F.3d at 1056. There is no comparable concern here for the Tribe's claims against the Union concerning its alleged failure to follow the Tribal Labor Ordinance. (*See* MTD Order 22:15–24:15.) Hence, that the Tribe is a signatory to a tribal-state compact does not mean there is federal jurisdiction to purportedly enforce the Tribal Labor Ordinance against the Union in federal court. (*See id.*)

Second, Pauma argues this suit involves not only violations of the Pauma Compact, but also violations of IGRA. (Mot. 3:10–4:3.) As noted above, Pauma's Third Amended Complaint retitles many of its claims against the Union to be claims for not only breach of the Pauma Compact—the description used in the Second Amended Complaint—but also for "[v]iolation of IGRA." (*See, e.g.*, TAC 54:21–24.) Therefore, Pauma's theory is that the Union's alleged failure to follow the Tribal Labor Ordinance, which is attached to the Pauma Compact, means the Union has also violated IGRA. The Court is unpersuaded that this theory is a viable basis for federal jurisdiction over the Tribe's claims against the Union. IGRA regulates the conduct of states and tribes, not other parties. *See infra* Part I. As the Court previously noted, Pauma does not identify—and the Court has not located—any decision in this circuit that provides IGRA confers jurisdiction over claims by tribes against private parties. (*See* MTD Order 24:8–12.) Pauma may instead pursue its purported breach of contract claims against the Union in a state or tribal forum.

Third, Pauma argues federal jurisdiction is appropriate because there is a statutory conflict between IGRA and the NLRA. (Mot. 4:4–26.) A purported conflict

between IGRA and the NLRA is insufficient to create jurisdiction over Pauma's claims against the Union. And the Ninth Circuit has not discerned "any conflict between the NLRA and IGRA." *Pauma*, 888 F.3d at 1079. Therefore, the Court rejects this argument.

Fourth, Pauma argues the FAA plays a role in the analysis because the Tribe is seeking enforcement of arbitration terms "in a federal contract under one federal statute that seemingly conflict with a second federal statute and which a third federal statute provides grounds to enforce." (Mot. 4:27–5:12.) That Pauma is seeking to compel arbitration under the FAA does not change the Court's conclusion. Although the FAA "creates federal substantive law requiring the parties to honor arbitration agreements, it does not create any independent federal-question jurisdiction." *Southland Corp. v. Keating*, 465 U.S. 1, 16 (1984). Consequently, the Court is unpersuaded that the FAA's potential involvement in this suit means the Court has jurisdiction over Pauma's claims against the Union.

Finally, on a separate note, Pauma requests that this Court delay any further orders until the Supreme Court acts on its petition for writ of certiorari in *Casino Pauma v. N.L.R.B.*, 888 F.3d 1066 (9th Cir. 2018). (Mot. 5:13–22.) Since Pauma made this request, however, the Supreme Court acted; the Court denied Pauma's petition on May 20, 2019. *Casino Pauma v. N.L.R.B.*, — S. Ct. —, 2019 WL 133844 (May 20, 2019). There is therefore no longer any potential reason to "abstain from addressing the jurisdictional issues" in this case. (*See* Mot. 5:20–22.)

Accordingly, the Court remains unconvinced that Pauma pleads a requisite controversy against the State, and Pauma fails to demonstrate this Court has federal jurisdiction over the Tribe's claims against the Union. Because Pauma's Proposed Third Amended Complaint is futile, the Court denies Pauma's motion for leave to amend.

\* \* \*

1 | Having resolved whether granting Pauma leave to file the Proposed Third Amended Complaint is appropriate, the Court addresses one final issue: Pauma contends at the end of its motion that jurisdiction "assuredly exists" if Pauma modifies its complaint to seek rescission of the Tribal Labor Ordinance portion of the Pauma Compact. (Mot. 5:23–6:13.) Pauma suggests that it would change its strategy to seek rescission if the "NLRB indisputably has jurisdiction over Indian tribes." (*Id.*)

Pauma's intimation, however, does not change the outcome of this motion. Pauma has never sought rescission of all or part of the Pauma Compact in this lawsuit, and its Proposed Third Amended Complaint does not include allegations addressing this issue. Further, it is unclear whether Pauma believes the NLRB now "indisputably" has jurisdiction over tribes simply because the Supreme Court denied Pauma's petition for review. In the Court's view, Pauma is suggesting what would be a significantly different lawsuit than the one before the Court, which has focused on enforcing the Tribal Labor Ordinance against the Union and obtaining damages for breach of the Ordinance. Regardless, the Court lacks jurisdiction over the claims raised in Pauma's Proposed Third Amended Complaint. And Pauma has already been afforded the opportunity to remedy the defects in its pleading, which the Tribe has not done. The Court thus concludes dismissing this action without prejudice for lack of jurisdiction is warranted. *See, e.g.*, *Kelly v. Fleetwood Enters., Inc.*, 377 F.3d 1034, 1036 (9th Cir. 2004) (providing a dismissal based on lack of subject matter jurisdiction should be without prejudice); *see also Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988) ("Ordinarily, a case dismissed for lack of subject matter jurisdiction should be dismissed without prejudice so that a plaintiff may reassert [its] claims in a competent court.").

//
//
//

## CONCLUSION

In light of the foregoing, the Court **DENIES** Pauma's motion for leave to file a third amended complaint (ECF No. 44). The Clerk of the Court shall enter judgment dismissing without prejudice Pauma's action and shall close this case.

**IT IS SO ORDERED.**

DATED: June 3, 2019

Hon. Cynthia Bashant
United States District Judge